444 F.2d 841
 143 U.S.App.D.C. 383, 1 Media L. Rep. 2003
 GREATER BOSTON TELEVISION CORPORATION, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, WHDH, Inc., a
MassachusettsCorporation, Intervenor.
WHDH, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, Greater Boston
TelevisionCorporation, a Massachusetts
Corporation, Intervenor.
CHARLES RIVER CIVIC TELEVISION, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, WHDH, Inc.,
Boston BroadcastersInc., Intervenors.
WHDH, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, Boston
Broadcasters, Inc., Intervenor.
GREATER BOSTON TV CO., Inc., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, WHDH, Inc.,
Boston BroadcastersInc., Intervenors.
 Nos. 17785, 17788, 23154, 23159, 23172.
 United States Court of Appeals, District of Columbia Circuit.
 Argued May 25, 1970.
Decided Nov. 13, 1970, As amended Dec. 31, 1970, Petitions
for RehearingDenied and Opinion Modified Feb. 16,
1971, Certiorari Denied June 14, 1971,
See91 S.Ct. 2229, 2233.
 
 Mr. J. Joseph Maloney, Jr., Boston, Mass., for appellant in Nos. 17,785 and 23,172 and intervenors in No. 17,788.
 Mr. William J. Dempsey, Washington, D.C., with whom Messrs. William C. Koplovitz, J. Richard Carr and John J. Dempsey, Washington, D.C., were on the brief, for appellant in Nos. 17,788 and 23,159 and intervenor, WHDH, in Nos. 17,785, 23,154 and 23,172. Mr. Harry J. Ockershausen, Washington, D.C., was also on the brief for appellant in No. 17,788.
 Mr. Harry M. Plotkin, Washington, D.C., with whom Messrs. Thomas Schattenfield, and William L. Fishman, Washington, D.C., were on the brief, for appellant in No. 23,154.
 Mr. Henry Geller, General Counsel, Federal Communications Commission, with whom Messrs. John H. Conlin, Associate General Counsel, Edward J. Kuhlmann and Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, were on the brief, for appellee.
 Mr. Benito Gaguine, Washington, D.C., with whom Mr. Donald E. Ward, Washington, D.C., was on the brief, for intervenor, Boston Broadcasters Inc., in Nos. 23,154, 23,159 and 23,172.
 Messrs. Vincent B. Welch and Gerald S. Rourke, Washington, D.C., filed a brief on behalf of Hampton Roads Television Corporation and Community Broadcasting of Boston, Inc., as amici curiae.
 Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.
 LEVENTHAL, Circuit Judge:
 
 
 1
 This appeal marks the culmination of a sixteen year struggle to determine the licensee to operate a television station on Channel 5 in Boston. Rivals for the license have been before this court on three previous occasions.
 
 
 2
 The Federal Communications Commission previously made a limited award to WHDH, Inc., and that company has been operating the station, WHDH, under temporary authorization. In the decision now under appeal, the Commission, after an extensive comparative hearing, approved the application of Boston Broadcasters, Inc. (BBI), and denied the mutually exclusive applications of WHDH, Inc., Charles River Civic Television, Inc., and Greater Boston Television Corp. (II). 16 F.C.C.2d 1, (January 22, 1969). This result was adhered to on reconsideration by the Commission, although the petition for rehearing filed by WHDH was granted in part. 17 F.C.C.2d 856 (May 19, 1969). We affirm the decision of the Commission.
 
 I. COMMISSION PROCEEDINGS
 A. Historical Background
 
 3
 The initial proceeding to select a licensee to operate on Channel 5 in Boston began in 1954 with consideration of four mutually exclusive applications. Three years later, the Commission announced the granting of the application of WHDH, Inc., a wholly owned subsidiary of the corporate publisher of the Boston Herald-Traveler newspaper. 22 F.C.C. 767. The station began broadcasting in the same year. While the decision was on appeal in this court, it came to the court's attention that the Commission's award might be subject to an infirmity by virtue of improper ex parte contacts with the Chairman of the Commission. Retaining jurisdiction, we remanded to the Commission for an evidentiary hearing. Massachusetts Bay Telecasters, Inc. v. F.C.C., 104 U.S.App.D.C. 226, 261 F.2d 55 (1958), cert. denied, 366 U.S. 918, 81 S.Ct. 1094, 6 L.Ed.2d 241 (1961).
 
 
 4
 At the supplemental hearing before a Special Hearing Examiner, Honorable Horace Stern, formerly Justice of the Pennsylvania Supreme Court, it developed, inter alia, that during the pendency of the initial license proceedings, Mr. Robert Choate of WHDH, Inc., had arranged two luncheons with Mr. George C. McConnaughey, then Chairman of the FCC. The first of these, in the winter of 1954-55, was used by Mr. Choate for the simple purpose of 'sizing up' the new chairman. The second, however, in the spring of 1956 (after the initial hearing examiner's decision favoring another applicant, but before oral argument on exceptions to that decision), was arranged to allow Mr. Choate to discuss certain legislative matters, unspecified in advance, with Mr. McConnaughey. The matters in question proved to be the Harris-Beamer bills, which would have limited the Commission in its policy of encouraging the diversification of ownership of mass media of communication, and which had been opposed in Mr. McConnaughey's testimony before Congress. At the second luncheon Mr. Choate attempted to hand Mr. McConnaughey a draft amendment to the pending bills, which he hoped would moderate the Chairman's opposition. The Chairman, however, rebuffed Mr. Choate's attempt at discussion, and later called public attention to the matter in testimony before the House Committee on Legislative Oversight.
 
 
 5
 The Special Hearing Examiner concluded that WHDH's construction permit should be allowed to stand, that Choate could not fairly be condemned as having made an improper attempt to influence the Commission as to this particular adjudication, that there was no reason for the Chairman of any other member of the Commission to disqualify himself from participation, and that the award made to WHDH was neither void nor viodable. The Commission felt otherwise. It discerned a meaningful and improper, albeit subtle, attempt to influence the Commission, and condemned it as an effort that 'does violence to the integrity of the Commission's processes.' See note 36, infra. It filed its report with this court-- which had retained jurisdiction over the original appeal, and ordered the status quo maintained. The Commission's finding and report concluded that while the original grant to WHDH was not void ab initio, it was voidable and action should be taken to set it aside, that the conduct of WHDH while not disqualifying had been such as to reflect adversely upon it in the comparison of applicants. The course which the Commission concluded represented the best exercise of its discretion consisted of setting aside the permit; granting at the same time a special temporary authorization for WHDH to continue broadcasting on Channel 5; and reopening the entire proceeding for a comparative proceeding between WHDH and the other applicants then before it. 29 F.C.C. 204 (1960). We approved the plan and remanded accordingly. Massachusetts Bay Telecasters, Inc. v. F.C.C., 111 U.S.App.D.C. 144, 295 F.2d 131, cert. denied, 366 U.S. 918, 81 S.Ct. 1094, 6 L.Ed.2d 241 (1961).
 
 
 6
 In October, 1961, the Commission held new hearings, this time among three of the four original applicants. On September 25, 1962, it again awarded a construction permit to WHDH. 33 F.C.C. 449. It ascribed a demerit to WHDH because of Choate's improper approaches to the Commission Chairman. In the same order it made a grant to WHDH of an operating license for only four months-- stating that it was exercising its discretion to grant a license for such a short term, as contrasted with the 3-year term permissible and normally provided, because it believed this in the public interest due to 'the inroads made by WHDH upon the rules governing fair and orderly adjudication.' 33 F.C.C. at 454. In 1963, after WHDH filed for its renewal, the FCC took the unusual step of assuring that comparative consideration would be given to competing applications filed within a specified 60-day 'safe' period. By order of October 24, 1963, it designated for comparative hearing the WHDH renewal and the mutually exclusive applications filed during that period by BBI (intervenor before this court) and Charles River and Greater Boston TV Corp. (II), appellants, for determination, on a comparative basis, which of the proposed operators would best serve the public interest in the light of significant differences among applicants as to (a) background and experience bearing on ability to operate the TV station; and (b) proposals for management and operation of the proposed TV station; and (c) proposed programming. 1 R.R.2d 468, 472.
 
 
 7
 Meanwhile, the grant of the 4-month license had been appealed to this court, both by WHDH (which protested the conclusion of impropriety on the part of Choate and the short term of the license) and by Greater Boston TV Corp. (I). On December 21, 1963, while this appeal was pending, Mr. Choate died. We remanded again to determine what effect his death would have on the awards. Being aware of the impending comparative hearings on the renewal of WHDH's temporary license, we authorized the Commission to combine the renewal proceedings with the proceedings, on remand, for reconsideration of the award of the construction permit and the 4-month operating license, both to be conducted on a comparative basis assessing the public interest in the light of the absence of Mr. Choate. Greater Boston Television Corp. v. F.C.C., 118 U.S.App.D.C. 162, 334 F.2d 552 (1964).
 
 B. The Current Comparative Proceeding
 
 8
 The consolidated comparative proceeding authorized by this court bagan in May, 1964, and there was full presentation by WHDH and the other three applicants.
 
 1. Hearing Examiner's Decision
 
 9
 On August 10, 1966, Hearing Examiner Herbert Sharfman issued an exhaustive Initial Decision, in favor of granting the renewal by WHDH. He concluded that the taint of Mr. Choate's activities had passed with his death, since none of the associates who might have been able to stop him were even aware, so far as the record shows, of the intention of the 'imperious' Mr. Choate, and that an extension of disability on the part of WHDH would not be deterrent or prophylactic but only vengeful.
 
 
 10
 In the bulk of his conclusions, related to a comparison of the applicants, the Hearing Examiner took account of the evidence pertaining to the various criteria laid down in the policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393 (July 28, 1965):-- past performance; diversity of ownership; integration of ownership and management; and program proposals. In determining the weight he felt appropriate under the circumstances of the case, the Examiner placed primary emphasis on the actual operating record of WHDH under the temporary authorizations of the preceding nine years.
 
 
 11
 The examiner conceded that the position of WHDH was weak in regard to the integration criterion (participation in station management by owners), and that both BBI and Charles River were proposed by a distinguished and indeed 'star-studded' group of civically active residents, offering strong claims on the score of area familiarity. The Examiner acknowledged that both BBI and Charles River proposed a diversity of excellent programs, though he offset this by noting that in the case of program proposals a new applicant enjoys a 'literary advantage' over an existing operator. He further noted that the abbreviated nature of the WHDH tenure conferred by the Commission made it clear that WHDH was not entitled to a competitive advantage merely because it is a renewing station. Yet the Examiner concluded that it would be a sterile exercise to decide this case on the basis of the traditional methods of comparison of new applicants. In his view the dominant factor on balance was that the proven past record of good performance is a more reliable index of future operations in the public interest than mere promises of new applicants, which have no means of validation except as the criteria may be helpful in predicting ability to comply with proposals. The WHDH operating record was considered favorable on the whole, notwithstanding its unwillingness to grasp the nettle of some local problems. As to diversification, the Examiner concluded that while the concentration of ownership of a Boston newspaper and other broadcast facilities would probably have ruled out the WHDH application if this were an allinitial license case, in this case the preference for WHDH on past record was not materially affected.[1] This, the Examiner felt, was in accordance with the Commission's long-standing policy in renewal proceedings, as established in Hearst Radio, Inc. (WBAL), 16 F.C.C. 141 (1951).
 
 
 12
 2. Commission's Decision of January 22, 1969
 
 
 13
 On January 22, 1969, the Commission reversed the Hearing Examiner's decision, and entered an order denying the application of WHDH and granting that of BBI. 16 F.C.C.2d 1. Its Decision reviewed the comparative merits of the applications.
 
 
 14
 Past Performance of WHDH: The Commission's Decision stated that the principles of the 1965 Policy Statement would be applied to the proceeding. Specifically it invoked the provision of its 1965 Policy Statement that an applicant's past record was to be given an affirmative preference only if it were outside the bounds of average performance. It read the Examiner's findings of fact as showing that the record of WHDHTV was 'favorable' on the whole-- except for its failure to editorialize-- but concluded that it was only within the bounds of average perfomance, and bounds of average performance, and to the public's needs or interests.' 16 F.C.C.2d at 10.
 
 
 15
 Diversification of Media of Mass Communications: WHDH's ownership by the Herald-Traveler resulted in an adverse factor on the diversification criterion. The Commission stated that the desirability of maximizing the diffusion of control of the media of mass communications in Boston was highlighted by the incident wherein the Herald-Traveler prematurely published a preliminary draft of the report of the Massachusetts Crime Commission without also simultaneously publicizing the report over the broadcast station. It was brought out at the hearing that such a news broadcast would have imparied the story's 'scoop' value for the Herald-Traveler.
 
 
 16
 The Commission further referred to the contention of WHDH that since it had never editorialized there existed a factor that minimized the charge of concentration of control. The Commission disagreed, stating that licensees have an obligation to devote reasonable broadcast time to controversial programs, and the failure to editorialize, if anything, demonstrated teh wisdom of the Commission's policy for diversification of control of media of mass communications. On the factor of diversification, it concluded by awarding a substantial preference to both BBI and Charles River as against WHDH, and giving BBI a slight edge over Charles River (which also operates an FM radio station in Waltham, Massachusetts devoted to serious music).
 
 
 17
 Integration of Ownership with Management: The Commission affirmed the Examiner's conclusion that the applications of both Charles River and BBI reflect an integration-- which in FCC parlance means integration of ownership with management-- of substantially greater degree than WHDH, whose integration is small. It restated its view that the public interest is furthered through participation in operation by proprietors, as increasing the likelihood of greater sensitivity to an area's changing needs and programming to serve these needs.
 
 
 18
 As between Charles River and BBI, the Commission found that BBI rated a significant preference on integration (six of BBI's stockholders propose to serve as full-time management, two of whom have had significant television experience, as opposed to only one Charles River participating owner, whose experience was limited to radio).
 
 
 19
 Proposed Program Service: The Commission agreed that boht BBI and Charles River proposed generally wellbalanced program schedules, and concluded that neither proposal demonstrated such a substantial difference as to constitute a 'superior devotion to public service.' 16 F.C.C.2d at 15.
 
 
 20
 The Commission assigned a slight demerit to BBI because of its insufficiently supported proposal for local live programs, for which it projected an extraordinary ordinary percentage of 36.3% Of 160.5 hours of weekly programming. It adopted the findings of the Hearing Examiner that this was only a 'brave generality' which generated the suspicion that it was flashed for its supposed value in a comparison.
 
 
 21
 The Commission assessed a slight demerit against Charles River in view of the fact that all its stock is owned by Charles River Civic Foundation, a charitable foundation complying with Section 503(c)(3) of the Internal Revenue Code. 'Although Charles River proposes to editorialize, it is manifest that there are limitations on the amount of time that could be devoted to controversial questions which may be legislatively related, and that such limitations are not found in ordinary television station operations.' 16 F.C.C.2d at 17.[2]
 
 
 22
 The slight demerits assessed against BBI and Charles River on proposed program service were deemed to offset each other.
 
 
 23
 Other Factors: The Commission assessed a demerit against WHDH because of a failure to obtain the approval of the Commission on the transfer of de facto control when Choate was selected as president following the death of his predecessor, and when his death was followed by the accession of Akerson.[3] However, since there was no attempt at misrepresentation or concealment it was concluded that teh circumstances did not reflect so adversely on character qualifications as to warrant the absolute disqualification of WHDH.
 
 
 24
 The Commission's Vote: The Commission voted to grant the application of BBI. Its Decision was written by Commissioner Bartley, who was joined by Commissioner Wadsworth. Three commissioners did not participate in the decision (Hyde, Cox and Rex Lee). Commissioner Johnson concurred, with a statement indicating his strong opposition to the application of WHDH, and noting that this was supported not only by diversity of media, but also by the 'healthy' result of having at least one network-affiliated VHF television station that is independently and locally owned. 'I feel no passion,' he remarked, about the choice between BBI and Charles River, and stated that while normally he would not participate in a case that essentially involved a reconsideration of matters that arose before he became a member of the FCC,--'In this instance, however, my participation is necessary to constitute a working majority for decision. Accordingly I concur in today's decision.' 16 F.C.C.2d at 27. Commissioner Robert Lee dissented, voting to grant the application of WHDH, and abstaining from any choice as between BBI and Charles River.
 
 
 25
 3. The Commission's Action on Reconsideration
 
 
 26
 Reaction to the Commission's decision was swift. One distinguished commentator characterized it as a 'spasmodic lurch toward 'the left'.'[4] The television industry began organizing its forces to seek legislative reversal of what seemed to be a Commission policy, reversing Hearst, that placed all license holders on equal footing with new applicants every time their three-year licenses came up for renewal. On May 19, 1969, the Commission adopted a separate Memorandum Opinion and Order on the petitions of all parties for a rehearing. 17 F.C.C.2d 856.
 
 
 27
 While the Commission granted in part the petition for reconsideration by WHDH essentially its second opinion restated and reinforced the views stated in the Decision. It may be useful to mention the explication put forward, as it happens in response to exceptions by the favored applicant (BBI), which urged that the FCC state explicitly that its decision did not reaffirm the earlier grant to WHDH. BBI sought clarification of the status of WHDH as an applicant for initial license, rather than for renewal of license. Instead the FCC recited that WHDH's application was treated as one for the renewal of its license, and explicitly adopted the Examiner's conclusion that modification of the FCC's 1962 decision (granting a 4-month license) would not serve the public interest, that no change in that ruling was required as a result of Choate's death, and that reevaluation of the original record would be contrary to the public interest best served by terminating this lengthened proceeding.
 
 
 28
 The Commission added a closing paragraph to clarify that this was not an ordinary renewal case since 'unique events and procedures * * * place WHDH in a substantially different posture from the conventional applicant for renewal of broadcast license.' The FCC noted that WHDH's operation, although conducted some 12 years, has been for the most part under temporary authorizations. It did not receive a license to operate a TV station until September 1962, and then for only 4 months, because of the Commission's concern with the 'inroads made by WHDH upon the rules governing fair and orderly adjudication.' And in the renewal proceeding the FCC expressly ordered that new applications could be filed for a specified 2-month period, which was done and a proceeding held thereon.
 
 4. Subsequent Developments
 
 29
 While the Commission's decision was on appeal to this court, the legislative pressure continued to build. A bill, introduced by Senator Pastore, Chairman of the Communications Subcommittee of the Senate Commerce Committee, proposed to require a two hearing procedure, wherein the issue of renewal would be determined prior to and to the exclusion of the evaluation of new applications.[5] On January 15, 1970, the Commission issued a new Policy Statement, which, while retaining the single hearing approach, provided that the renewal issue would be determined first, in a proceeding in which new applicants would be able to appear to the extent of calling attention to the license holder's failings. 22 F.C.C.2d 424. Only upon a refusal to renew would full comparative hearings be held.
 
 
 30
 The Policy Statement set forth that a licensee with a record of 'solid, substantial service' to the community, without serious deficiencies, would be entitled to renewal notwithstanding promise of superior performance by a new applicant. This was said to provide predictability and stability of broadcast operations, yet to retain the competitive spur since broadcasters will wish to ensure that their service is so 'substantial' as to avoid the need for comparative proceedings.
 
 
 31
 The Commission expressly stated that its policy statement 'is inapplicable, however, to those unusual cases, generally involving court remands, in which the renewal applicant, for sui generis reasons, is to be treated as a new applicant.' 22 F.C.C.2d at 430. In such case the license holder cannot obviate the comparative analysis called for by the established Policy Statement, 1 F.C.C.2d 393 (1965).
 
 II. THE ISSUES ON APPEAL
 
 32
 A. General Conformance of Agency Disposition to Salient Principles of Rule of Law
 
 
 33
 We have presented at some length and detail the Commission's proceedings and disposition because we have given particular consideration to the Commission's procedures, findings and reasons, in this case, in order to assure ourselves that the decision on appeal satifies the basic requirements of the Rule of Law, as established by Administrative Law doctrine. That is always the court's task, but it is one discharged with vigilance in a case like this, where the administrative process was at one time blemished by ex parte contacts with agency heads.[6] Our alertness was also prompted in this case by the circumstance first that the agency rejected the result reached by its Hearing Examiner, and, further, that it was manifestly in a state of flux and evolution of its approach to the kind of issue presented by this proceeding.
 
 
 34
 Approaching this case as we have with full awareness of and responsiveness to the court's 'supervisory' function in review of agency decision,[7] it may be appropriate to take note of the salient aspects of that review. It begins at the threshold, with enforcement of the requirement of reasonable procedure, with fair notice and opportunity to the parties to present their case.[8] It continues into examination of the evidence and agency's findings of facts, for the court must be satisfied that the agency's evidentiary fact findings are supported by substantial evidence,[9] and provide rational support for the agency's inferences of ultimate fact.[10] Full allowance must be given not only for the opportunity of the agency, or at least its examiners, to observe the demeanor of the witnesses, but also for the reality that agency matters typically involve a kind of expertise-- sometimes technical in a scientific sense, sometimes more a matter of specialization in kinds of regulatory programs. Expert discretion is secured, not crippled, by the requirements for substantial evidence, findings and reasoned analysis. Expertise is strengthened in its proper role as the servant of government when it is denied the opportunity to 'become a monster which rules with no practical limits on its discretion.' Burlington Truck Lines v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). A court does not depart from its proper function when it undertakes a study of the record, hopefully perceptive, even as to the evidence on technical and specialized matters, for this enables the court to penetrate to the underlying decisions of the agency, to satisfy itself that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent.[11] 'The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia.' Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935-936, 19 L.Ed.2d 1090 (1968).
 
 
 35
 Assuming consistency with law and the legislative mandate, the agency has latitude not merely to find facts and make judgments, but also to select the policies deemed in the public interest. The function of the court is to assure that the agency has given reasoned consideration to all the material facts and issues.[12] This calls for insistence that the agency articulate with reasonable clarity its reasons for decision, and identify the significance of the crucial facts, a course that tends to assure that the agency's policies effectuate general standards, applied without unreasonable discrimination.[13] As for the particular subject of comparative hearings, the findings must cover all the substantial differences between the applicants and the ultimate conclusion must be based on a composite consideration of the findings as to each applicant.[14]
 
 
 36
 Its supervisory function calls on the court to intervene not merely in case of procedural inadequacies, or bypassing of the mandate in the legislative charter, but more broadly if the court becomes aware, especially from a combination of danger signals, that the agency has not really taken a 'hard look' at the salient problems,[15] and has not genuinely engaged in reasoned decision-making. If the agency has not shirked this fundamental task, however, the court exercises restraint and affirms the agency's action even though the court would on its own account have made different findings or adopted different standards. Nor will the court upset a decision because of errors that are not material, there being room for the doctrine of harmless error.[16] If satisfied that the agency has taken a hard look at the issues with the use of reasons and standards, the court will uphold its findings, though of less than ideal clarity, if the agency's path may reasonably be discerned,[17] though of course the court must not be left to guess as to the agency's findings or reasons.[18]
 
 
 37
 The process thus combines judicial supervision with a salutary principle of judicial restraint,[19] an awareness that agencies and courts together constitute a 'partnership' in furtherance of the public interest,[20] and are 'collaborative instrumentalities of justice.'[21] The court is in a real sense part of the total administrative process, and not a hostile stranger to the office of first instance. This collaborative spirit does not undercut, it rather underlines the court's rigorous insistence on the need for conjunction of articulated standards and reflective findings, in furtherance of evenhanded application of law, rather than impermissible whim, improper influence, or misplaced zeal.[22] Reasoned decision promotes results in the public interest by requiring the agency to focus on the values served by its decision,[23] and hence releasing the clutch of unconscious preference and irrelevant prejudice. It furthers the broad public interest of enabling the public to repose confidence in the process as well as the judgments of its decision-makers.
 
 
 38
 There was once a day when a court upheld the 'sensible judgments' of a board, say of tax assessors, on the ground that they 'express an intuition of experience which outruns analysis.'[24] There may still exist narrow areas where this approach persists, partly for historic reasons.
 
 
 39
 Generally, however, the applicable doctrine that has evolved with the enormous growth and significance of administrative determination in the past forty or fifty years has insisted on reasoned decision-making. The requirement of reasoned decision-making is under great tension when a certificating agency is required to choose between two or more applicants endowed with virtually equivalent qualifications. But at least so long as the government uses the forms of adjudication, and does not turn, e.g. to bidding, or even chance, as the most feasible guarantor of neutral and acceptable selection,[25] reasoned decision-making remains a requirement of our law.
 
 
 40
 Judicial vigilance to enforce the Rule of Law in the administrative process is particularly called upon where, as here, the area under consideration is one wherein the Commission's policies are in flux. An agency's view of what is in the public interest may change,[26] either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored,[27] and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.[28]
 
 
 41
 The net result of our study and reflection in this case is our conclusion that the record findings and opinions before us, while not without problems, reveal in essence that the Commission has been diligent to take a hard look at the problem areas, and to set forth with clarity grounds of reasoned decision which we think permissible.
 
 
 42
 It merits interjection that the shape of the agency's disposition was aided in no samll measure by the Initial Decision of the Hearing Examiner, and the Examiner's careful and indeed exhaustive review of the evidence and issues, and comparisons of the applicants in regard to each of the pertinent criteria. It does not decry the significance and value of the Examiner's efforts that the Commission disagreed with his decision and with several of his conclusions; indeed, it attests to his care that his decision was useful although the conclusion was reversed.
 
 
 43
 The Examiner's decision is part of the record, and the record must be considered as a whole in order to see whether the result is supported by substantial evidence.[29] The agency's departures from the Examiner's findings are vulnerable if they fail to reflect attentive consideration to the Examiner's decision.[30] Yet in the last analysis it is the agency's function, not the Examiner's, to make the findings of fact and select the ultimate decision, and where there is substantial evidence supporting each result it is the agency's choice that governs.[31] Here, the Commission accepted the Examiner's findings and conclusions to a substantial degree; and when it did not, the Commission made clear not only its awareness of what the Examiner had concluded, but also its reasons for taking a different course.
 
 
 44
 The court's conclusion as to the general scope and character of the agency's findings and reasoned decision provides prologue and perspective for the discussion of the particular contentions raised by appellants.
 
 
 45
 B. Issues Posed by Appellant WHDH, Inc.
 
 
 46
 1. Contention that WHDH Was Entitled to Same Consideration As Renewal Licensee
 
 
 47
 WHDH's central contention rests on its 4-month operating license, duly granted by the Commission[32] in 1962, and the Commission's determination, in the decision before us on this appeal, to adhere to the grant of the original application of WHDH to that extent.
 
 
 48
 WHDH makes no serious contention that it could protest the grant to intervenor BBI if the Commission proceeded validly in comparing these applications by the criteria used by the Commission for appraisal of new applicants for facilities. On that basis it is undeniable that a strong preference would be available to BBI in view of the 'integration' and 'diversity' criteria. WHDH objects that such preferences were set forth by the 1965 Policy Statement governing comparative hearings involving new applications for new facilities, and are not properly available in a renewal proceeding. It was by application of the criteria generally used for renewal proceedings that the Examiner entered a decision in favor of WHDH. The failure of the Commission to apply renewal criteria is the core of the WHDH appeal.
 
 
 49
 The application of the criteria in the 1965 Policy Statement is said to impose an unlawful forfeiture on WHDH amounting to a denial of due process, and to constitute an improper refusal to honor the established policy of promoting broadcast license stability.
 
 
 50
 There is no doubt that the Commission applied to this proceeding, although it is a renewal proceeding, the same criteria that it normally applies for hearing new applicants for facilities. The effect of that determination was to give WHDH no predicate for renewal on the basis of a sound or 'favorable' record in its license operation, and to hold that only an exceptional record would warrant special consideration (since all applicants would be presumed to offer a normal range of operation).
 
 
 51
 If the case were before us solely on the Decision adopted by the Commission on January 22, 1969-- susceptible of the construction that the 1965 Policy Statement was applicable to all renewal proceedings-- we would be presented with a different question. While the 'forfeiture' terminology invoked by WHDH may be more of a conclusion than a reason, and while this statute does not reflect the same concern for 'security of certificate' that appears in other laws, cf. C.A.B. v. Delta Air Lines, Inc., 367 U.S. 316, 322 n.6, 324-325, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961), there would be a question whether the Commission had unlawfully interfered with legitimate renewal expectancies implicit in the structure of the Act. In addition, a question would arise whether administrative discretion to deny renewal expectancies, which must exist under any standard, must not be reasonably confined by ground rules and standards-- a contention that may have increased significance if First Amendment problems are presented on renewal application by a newspaper affiliate, including the possibility that TV proceedings may come to involve overview of newspaper operations. Those problems are magnified if a licensee on the one hand may avoid comparison only by maintaining extraordinary performance, and on the other hand court disaster, in the event of comparison, by virtue of the diversity policy, whether expressed in a formal demerit or some inchoate burden.
 
 
 52
 Fortunately, the present posture of this case permits us to refer to these problems as matters that are not involved in our decision. The Commission's opinion of May 19, 1969, entered on reconsideration, expressly puts this case in a special and unique category because of the past history of WHDH.[33]
 
 
 53
 This interpretation of its action is underscored by the 1970 Policy Statement on Comparative Hearings Involving Renewal Applicants.[34] This Statement in essence carries forward the general policy on renewals expressed in Hearst Radio, Inc. (WBAL), 15 F.C.C. 1149 (1951), on which WHDH places substantial reliance. The Commission's 1970 statement puts its policy thus (see 22 F.C.C.2d at 425):
 
 
 54
 If the applicant for renewal of license shows in a hearing with a competing applicant that its program service during the preceding license term has been substantially attuned to meeting the needs and interests of its area, and that the operation of the station has not otherwise been characterized by serious deficiencies, he will be preferred over the newcomer and his application for renewal will be granted. His operation is not based merely upon promises to serve solidly the public interest. He has done so. Since the basic purpose of the act-- substantial service to the public-- is being met, it follows that the considerations of predictability and stability, which also contribute vitally to that basic purpose, call for renewal.
 
 
 55
 The permissibility of the general policy continued by this Statement is not in issue since that is not challenged, if anything it is relied on, by WHDH. Assuming its validity, the Commission's failure to apply the policy to WHDH is not error.
 
 
 56
 The Commission's 1970 Policy Statement carries a proviso, set forth in the footnote,[35] indicating that it is inapplicable to 'those unusual cases, generally involving court remands, in which the renewal applicant, for sui generis reasons, is to be treated as a new applicant.' In such cases the applicant's record will be examined, but subject to the comparative analysis called for by the 1965 Policy Statement.
 
 
 57
 We think the distinction drawn by the Commission, in both this case and the 1970 statement, providing for special consideration of certain renewal applicants, as in remand cases, as if they were new applicants, to be reasonable both generally and in its application to the case before us.
 
 
 58
 We have re-examined the Commission docket which was before us in 1963, when we remanded for further proceedings. The Commission's action was based on its critical decision of July 14, 1960, where it reviewed the record and concluded that Robert Choate, who was teh principal officer of WHDH, had 'demonstrated an attempted pattern of influence.'[36]
 
 
 59
 Thus the Commission superseded the September 23, 1959 decision of Special Hearing Examiner Stern, 18 R.R. 1101, who had concluded that the activities of Choate were not such as to render the construction permit to WHDH either void or voidable. Justice Stern reasoned that Choate was visiting Chairman McConnaughey not in his adjudicative role but as one who had been a hostile witness before a legislative committee, and 'did not make any culpable attempt to influence his vote in the Channel 5 proceedings.' Nor was such effort made on any of the occasions when Choate had casual social contacts, as at lunches and receptions, with the Commissioners. Justice Stern interpolated that social relations with public officials are not taboo, for they are not required to live in ivory towers, so long as no 'marked attention or unusual hospitality' is involved. And Justice Stern reiterated in strongest terms that there was no attempt on the part of Choate to present the merits of the Herald's application or its organization, nothing that could justifiably be regarded as impairing the propriety of the award made.
 
 
 60
 The Commission took a different view. The matter is important enough that we have set out its findings (see note 36), to let them speak for themselves. The essence of the matter is that the Commission discerned that although Choate did not in terms refer to his application, his purpose was not to size up the Chairman as much as to let the Chairman size him up-- 'to demonstrate by his demeanor and presence that he was a responsible man representing responsible interests who merited favorable consideration of their application.'
 
 
 61
 The fabric of Administrative Law, stiffened with Justice Stern's own eloquence in another proceeding, establishes the discretion available on principles of fair play to take appropriate action when parties seek to influence the results of a proceeding by factors not a part of the hearing record. WKAT, Inc. v. F.C.C., 111 U.S.App.D.C. 253, 260, 296 F.2d 375, 382, cert. denied, 368 U.S. 841, 82 S.Ct. 63, 7 L.Ed.2d 40 (1961). Although in the present case, unlike others, this Examiner perceived no misconduct, that issue, and the assessment of the seriousness of the misconduct, involves the judgment and discretion of the Commission. The Commission-- wise in the ways of the administrative world-- must be given reasonable latitude in its efforts to keep its processes free of taint. The Commission was within the range of its discretion when it found misconduct, for the fact that Choate's effort was low key did not render it less significant, or less likely to be successful. The Commission was within the range of sound discretion when it decided to take remedial measures because the 'attempt to establish such a pattern of influence does violence to the integrity of the Commission's processes.' 29 F.C.C. at 212.
 
 
 62
 There is no chart that can forecast the flow and pace of sound administrative discretion, and hence there is always some possibility of surprise. The same might be said of stiffenings and relaxations of sentencing policy that pulse through the courts, often long after the crimes. Discretion is particularly broad when an agency is concerned with fashioning remedies and setting enforcement policy. Consolo v. F.M.C., 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); WOKO, Inc. v. F.C.C., 71 U.S.App.D.C. 228, 109 F.2d 665 (1939). The burden of establishing a claim of illegality is a heavy one, and WHDH cannot successfully contend that the judicial conscience must be shocked by what the Commission has done.
 
 
 63
 The Commission stayed within the range of sound discretion when it adopted, as successive remedial measures, voiding the original grant to WHDH (though not void ab initio); remanding for a comparative reevaluation of the original applicants; confining the grant given to WHDH as the better of the original applicants to a mere 4-month operating license; providing for a reopening period of two months, in order to permit a comparative evaluation with new applicants proposing to serve the public interest.
 
 
 64
 While the precise nature of the forthcoming comparative evaluation was not spelled out in detail, WHDH certainly has no basis for suggesting it had an assurance of being treated by the same criteria as those generally accorded to renewal applicants.
 
 
 65
 If anything turned on this we would have to recognize that WHDH was not expressly informed in advance that the comparison between WHDH and its rivals was to be conducted by reference to the criteria normally used for a new application devoid of any elements of renewal. But this did not affect the range of proof which any party might tender or contest. Although the 1965 Policy Statement did not purport to deal with the problems raised by renewal applications the Commission concluded in the same year that the policy statement properly governed the nature and scope of evidence contemplated for renewal proceedings. Seven (7) League Productions, Inc. (WIII), 1 F.C.C.2d 1597, 1598 (1965). Each applicant was aware that its task was to make the best case possible on the basis of program offering, integration, diversification, past performance and any other matters the parties asked the Commission to consider as pertaining to licensee fitness. As the Hearing Examiner noted, all the applicants were given the fullest opportunity to display their advantages. It is certainly not uncommon for a contender to be called on to put forward all the factors he deems favorable though he cannot be confident what absolute or relative weights will be accorded by those charged withappraisal and judgment.
 
 
 66
 There being no impediment in the content or shape of the record due to lack of fair notice, certainly we cannot say the Commission was unreasonable when in the last analysis it used the tainted overtures of WHDH as a reason for fresh consideration of all applicants, without any special advantage to WHDH by virtue of its operation under lawful but temporary authority. This is what the law seeks to ensure whenever selection of a contender must be made after a hearing, although one of the applicants has been given temporary authority, either without a hearing at all because of emergency,[37] or after a proceeding subject to a defect. Braniff Airways v. C.A.B., 126 U.S.App.D.C. 399, 379 F.2d 453 (1967).
 
 
 67
 The complaint of WHDH must be appraised in the light of the courses available to the Commission for coping with the problem presented by the activities of Mr. Choate. At one extreme, the Commission was being asked (by Greater Boston) to take it into account to such extent as would in effect impose an absolute disqualification; this it did not do.
 
 
 68
 WHDH in effect suggests the other extreme-- a brushing aside of the entire matter on the ground that the offending officer is no longer involved, and the corporation has not profited by his delict. The Examiner used this conception on the ground that no reason for deterrence could apply to the unimplicated officers presently managing the station. But the policy of deterrence may have a broader significance. It may take into account that an officer might well be willing to try his hand at an impropriety if all that is involved is a calculated risk as to his own position (which would be enormously enhanced if he is successful), whereas he would possibly be deterred if he realized that his mal-adventure, if discovered, would be costly to the friends and associates who had invested in the enterprise.
 
 
 69
 In between these extremes are possibilities like a comparative hearing with a demerit assigned to WHDH; that was done by the Commission in its Decision of September 25, 1962, which, however, left the Commission with the conviction that while it would still make a grant to WHDH, a customary 3-year grant was not in the public interest.
 
 
 70
 The Commission's action in exposing WHDH to another public hearing with new applicants, a hearing scheduled soon after the date of its order, is a disadvantage from the viewpoint of WHDH, but we cannot say it was contrary to the public interest. After this court's remand, to take account of Choate's death, the Commission set a course that retained its order for a hearing with new applicants, but avoided a specific demerit for WHDH in that comparative consideration. This was preferable to an approach wherein a demerit would be inserted into the comparison with new applicants, preferable both for WHDH and, it would seem, for the public interest.[38] WHDH insists, however, on an approach which would give it all the rights and expectancies of an ordinary renewal applicant. In the ordinary case such expectancies are provided in order to promote security of tenure and to induce efforts and investments, furthering the public interest, that may not be devoted by a licensee without reasonable security. This position does not fairly characterize the situation of a licensee which, by virtue of its officer's impropriety, has been given only temporary operating authority of one kind or another (including the 4-month license). This was the conclusion of both the Hearing Examiner and the Commission (as refined on reconsideration), and we think it within the range of reasonable discretion.
 
 
 71
 The determination that in certain cases a renewal application must be conducted on the basis of a new comparative consideration is not necessarily a 'punishment' for wrongdoing. The same result may follow even where the ineptitude and errors of the Commission may be more to blame than the licensee for the state of affairs precipitating that result.[39] The central consideration is that there is a special class of cases where this method of reaching the optimum decision in the public interest may be fairly invoked without undercutting whatever expectancies may attach in general to licensees seeking renewal.
 
 
 72
 The Commission's action in pitting WHDH against its rivals for fresh comparative consideration is not negatived by its insistence on its 1962 issuance, preserved in its 1969 decisions, of a license. Presumably, the use of a 4-month license rather than some other kind of temporary operating authority reflected practical, procedural considerations. Compare WKAT, Inc. v. F.C.C. 111 U.S.App.D.C. 253, 261, 296 F.2d 375, 383, cert. denied, 368 U.S. 841, 82 S.Ct. 637, 7 L.Ed.2d 40 (1961). The Commission may have thought the 4-month license would be preferable as serving to finalize the proceeding, so far as the then-operative rival was concerned, though this was later undercut by this court's remand. The 4-month license did not operate to make WHDH a conventional applicant for renewal, and that is the core of its position in this court.
 
 
 73
 The Commission did not try, as WHDH suggests, to erase the operating record and experience of WHDH and its principals. In effect what it did was to hold WHDH to a higher comparative standard than that required of renewal applicants generally in order to be able to invoke a past record as a reason for rejecting the promise of better public service by new applicants. The Hearing Examiner considered that a good record of past performance was a more reliable indicator of public service than glowing promise. The Examiner was not as impressed as the Commission by the reliability of criteria as indicators validating the likelihood of performance. Also, he does not seem to have taken into account the problem that his approach provided in effect a 'built-in-lead' from actual operation, although he disclaimed any right of WHDH to a privileged position as an applicant for renewal. The Commission, on the other hand, was more concerned with keeping the parties as close as possible to a new application situation, without undue advantage acquired from the physical fact of operation under a temporary authorization.
 
 
 74
 We think the course adopted by the Commission cannot be considered as arbitrary or unreasonable, or as in violation of legislative mandate. The remedies fashioned through the exercise of its discretion are not without an element of novelty. 'In the evolution of the law of remedies some things are bound to happen for the 'first time." International Bhd. of Operative Potters v. N.L.R.B. 116 U.S.App.D.C. 35, 39, 320 F.2d 757, 761 (1963). Hand crafted orders and procedures are particularly appropriate for unique fact situations. On the unique facts presented, WHDH was neither a new applicant nor a renewal applicant as those terms are generally construed. Since these orthodox classifications, and the rules generally pertaining to each, were not meaningfully available to the Commission on these facts, that body soundly formulated an intermediate position for the instant case. There was no error.
 
 2. Other Issues
 
 75
 The other issues raised by WHDH do not require reversal. It was rated inferior to its rivals on the diversification and integration criteria.
 
 
 76
 a. Diversification of Controls of Media of Mass Communications
 
 
 77
 The Commission assigned a preference to Diversification of Control of the Media of Mass Communications. Plainly the Commission does not exceed its powers in seeking to avoid rather than foster a concentration of control of the sources of news and opinions.[40]
 
 
 78
 The need for diversity, and the danger of concentration, is not as great in Boston as in smaller markets. That consideration apparently contributed to the Commission's original 1957 decision, and again its 1962 decision, following a comparative hearing, to prefer WHDH to its then rival. That the diversity criterion was prominent in the 1969 rejection of WHDH does not necessarily indicate that the Commission's standards changed. It is merely another aspect of the situation that after 1963 WHDH was confronted with more effective competitors then previously. It is ironical rather than unjust that the efforts of WHDH establishing the availability of profits may have stimulated the new applications.
 
 
 79
 We take note, as WHDH requests, of the Red Lion decision, which approves the FCC's policy of requiring licensees, under the 'fairness' doctrine, to provide a voice to more than one side of important controversial issues. Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). We do not agree that Red Lion has, as WHDH put it, 'pulled the rug from under the pretentious Policy Statement justification of its 'diversity' criterion.' The point is more soundly put by saying that the importance of avoiding concentration of control in communication is such an important objective that the Commission must be accorded discretion in choice of measures for its fulfillment. Philadelphia TV Broadcasting Co. v. F.C.C.,123 U.S.App.D.C. 298, 359 F.2d 282 (1966).
 
 
 80
 The Commission need not be confined to the technique of exercising regulatory surveillance to assure that licensees will discharge duties imposed on them, perhaps grudgingly and perhaps to the minimum required. It may also seek in the public interest to certify as licensees those who would speak out with fresh voice, would most naturally initiate, encourage and expand diversity of approach and viewpoint.
 
 
 81
 Further, as the Commission pointed out, its concept of the public interest contemplated initiating of editorials by licensees. This embraces selection of topics for probing, and emphasis given to topics, as well as fairness in presentation of views on each topic. There is a public interest in diversity in policy areas lit by the lantern of editorial probes, and for that matter by reportorial assignments and coverage.
 
 
 82
 WHDH complained it was wrongfully penalized for failure to editorialize. And it can readily be discerned that aggressive editorializing by WHDH would have provided its rivals with ammunition. This does not undermine the Commission's opinion; it rather underlines the inherent difficulty confronting the affiliate of a newspaper, at least one seeking a new license.
 
 
 83
 Some aspects of the Commission's discussion are more bothersome. Thus the Commission discussed an instance in which WHDH delayed relay of a story published in the Herald-Traveler as a 'scoop'-- a preliminary account of a report of the Massachusetts Crime Commission. The Examiner disclaimed 'competence to assess any blame because the Herald-Traveler chose to disclose the draft, a printed document, in its natural medium, print, rather than perhaps weaken its effect by publicizing it orally.' 16 F.C.C.2d at 92. This observation is not without merit, and we do not see why the Commission should have pursued this instance if its purpose was only, as it said, to highlight the importance of the diversification criterion. We do not pursue the point further for even assuming error its impact in overall context was minimal rather than substantial.
 
 
 84
 b. Transfer of De Facto Control
 
 
 85
 The Commission imposed a comparative demerit against WHDH for failure to report changes of de facto control of the licensee with the change of presidency. The Commission, like the Examiner, found that in this particular situation this amounted to a transfer of actual control and management of corporate affairs. The Examiner reached the same conclusion, but thought it warranted no consideration because of lack of precedent explicity requiring the report.
 
 
 86
 The problem is not without difficulty. On the one hand there is need to report transfers of actual control and the Commission has a discretion as to appropriate remedies. Lorain Journal Co. v. F.C.C., 122 U.S.App.D.C. 127, 132, 351 F.2d 824, 829 (1965), cert. denied, 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966). As there noted, the Commission has warned that in case of doubt licensees may seek appropriate advice of the Commission. And here the Commission did not assert a disqualification, in view of the fact that there was no misrepresentation or concealment by WHDH, but only assigned a demerit. Yet a demerit that loses a license is bitter tea. Ane the use of a sweeping rather than a more refined administrative remedy may, at least in some instances, represent an improvident use of administrative discretion, in the absence of state justification. Burlington Truck Lines v. United States, 371 U.S. 156, 173-174, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).
 
 
 87
 The difficulty of the issue is sharpened by prickly questions of notice and reasonableness of remedy, notwithstanding the wide discretion reserved to the Commission. However, there is doctrine supporting the Commission's action, at least prima facie. Taking into account the status of WHDH as in effect an applicant for a new license, and having in mind the essentially cumulative nature of this demerit, we think the interest of justice would not be served by refinement of the issues in the case at bar.
 
 C. Issues Raised by Charles River
 1. The Voting Question
 
 88
 Charles River presents a subtle, technical contention which is deftly stated but proves on analysis to reduce itself to this, that on the selection of BBI over Charles River a quorum was lacking since there were four abstentions (three Commissioners abstaining completely, and Commissioner Robert Lee who voted for WHDH, abstaining from a choice as between the two new applicants), and that Commissioner Johnson recoreded no great enthusiasm for BBI over Charles River.
 
 
 89
 The short answer is that four out of seven Commissioners constitutes a quorum; that the Commission may act, assuming a quorum of four or more, by the vote of a majority of those present;[41] and that in this docket out of the four Commissioners casting votes three Commissioners cast their vote in favor of an award to BBI.
 
 
 90
 Even assuming that Commissioner Johnson voted for BBI solely in order to avoid an impasse and to provide an effective order, that is a perfectly sound reason for his vote, and one that involves neither stultification nor irrationality. Government often involves the choice of the feasible, and the selection of the least undesirable alternative. It is accepted judicial practice for a judge to cast a vote, at least assuming no violation of conscience is involved, in order to avoid an impasse and secure a legally effective mandate for the court.[42] We also note that when this point was raised in the application of Charles River for reconsideration, Commissioner Johnson expressed no reservation in voting to deny that application and uphold the grant to BBI.
 
 2. Comparative Consideration
 
 91
 In terms of comparative consideration the choice between Charles River and BBI is closer than the issue whether to retain WHDH. In the last analysis, the Commission's order turns on the criterion of integration, of full-time participation in station operation by owners. Charles River's appeal is based on the fact that BBI's is only a paper claim.
 
 
 92
 The Commission's conclusion is not necessarily undercut, as Charles River contends, by the 'slight demerit' that the Commission assigned to BBI for insufficient substantiation of its program proposal. The Commission was well within its discretion in treating this as a venial sin and not a character defect that in effect vitiated the application. The effect of this 'slight demerit' on BBI's program proposal was offset by a 'slight demerit' assigned to Charles River.[43] And so the two applicants were at a standoff under the criterion of proposed program service, as in essence resting on proposals no more than average in nature. That is, the Commission found no substantial differences, going beyond ordinary differences in judgment, which would establish a superior devotion to public service.
 
 
 93
 That in effect meant that the principal difference between Charles River and BBI was a difference in regard to the factor-- referred to in the Policy Statement as a factor of 'substantial importance'-- of integration, of 'participation in station management by owners.' To some extent this difference in presentation may reflect a difference in the style of the applicant. Charles River in effect says that the claims of BBI were so extreme as to be untrustworthy. While the Hearing Examiner took note of the 'exuberance' of BBI, he also pointed out that there was nothing wrong with an applicant's objective in fashioning its proposal so as to 'impress the Commission' unless there was no sincere belief that the project could be accomplished. And he noted that both applicants suffered from the 'endemic' taint of comparative applicants-- exaggerated advancement of claims. The shortfall of Charles River on the integration showing he attributed to its being 'excessively cautious.' Charles River says it is merely being realistic, proposing a 'meaningful' rather than spurious integration.
 
 
 94
 The Commission considered that the ultimate facts favored BBI on the integration factor. The Hearing Examiner's report concluded that Charles River was entitled to little or no credit on the score of integration, 16 F.C.C.2d at 258, para, 791, that perhaps out of 'reticence' it had not made as 'meaningful' a presentation as it had undoubtedly hoped even in staking out a modest credit for integration, 16 F.C.C.2d at 252, para. 796. As to BBI, while he expressed doubts concerning its presentation, he expressly declined to discard its proposal, 16 F.C.C.2d at 245, para. 759. There was no finding either of lack of bona fides or lack of practical possibility of fulfillment. It was the Commission's function to determine whether BBI's proposals merited belief in terms of practicability and likelihood of fulfillment. The Commission indicated its reasoning with reasonable clarity. It relied on the participation of the six BBI stockholders, and indicated what function each would perform. The findings are supported by substantial evidence in the record. 'It is the Commission, not the courts, which must be satisfied that the public interest will be served.' F.C.C. v. WOKO, Inc., 329 U.S. 223, 229, 67 S.Ct. 213, 216, 91 L.Ed. 204 (1946); WEBR, Inc. v. F.C.C., 136 U.S.App.D.C. 316, 420 F.2d 158 (1969). We see no reason to disturb its judgment.
 
 Affirmed.[44]
 
 
 [1]
 The fourth applicant, Greater Boston Television Corp. (II), was disqualified for failing to surmount two preliminary (non-comparative) questions: it had not made an independent evaluation of the community's program needs, nor had it been able to secure its proposed antenna site
 
 
 [2]
 The Commission was aware that applicant would be fully taxable, but took into account that the Internal Revenue Service might take the position that the parent's exemption would be lost if applicant did not comply with the Code provisions for tax-exempt organizations
 
 
 [3]
 The Commission approved the Hearing Examiner's conclusion that this was a transfer of control under 310 of the Communication Act in view of the 'peculiar but not unique situation of the Herald-Traveler in which management (the president) is in actual control.' 16 F.C.C.2d at 17. However, in view of the lack of Commission precedent the Examiner deemed it unfair to hold WHDH accountable for failure to realize the 'transfustion of ichor' required FCC approval. The Commission disagreed, its conclusion (as refined on reconsideration) being that there was a duty to obtain the approval of the FCC. The Commission also added that licensees had been instructed to proceed in any case of uncertainty by bringing the facts to the Commission's attention, for a determination whether Commission approval is required
 
 
 [4]
 Jaffe, WHDH: The FCC and Broadcasting License Renewals, 83 Harv.L.Rev. 1693, 1700 (1969)
 
 
 [5]
 S. 2004, 91st Cong., Sess. (1969) was sponsored by 22 Senators and 18 Representatives
 
 
 [6]
 Jacksonville Broadcasting Corp. v. F.C.C., 121 U.S.App.D.C. 69, 348 F.2d 75, cert. denied, 382 U.S. 893, 86 S.Ct. 186, 15 L.Ed.2d 150 (1965)
 
 
 [7]
 L. Jaffe, Judicial Control of Administrative Action 589 (1965)
 
 
 [8]
 Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Radio Athens, Inc. v. F.C.C., 130 U.S.App.D.C. 333, 401 F.2d 398 (1968)
 
 
 [9]
 Consolidated Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938)
 
 
 [10]
 City of Chicago v. F.P.C., 128 U.S.App.D.C. 107, 115, 385 F.2d 629, 637 (1967), cert. denied, 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968)
 
 
 [11]
 Los Angeles v. F.M.C., 128 U.S.App.D.C. 156, 159, 385 F.2d 678, 681 (1967)
 
 
 [12]
 Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); City of Pittsburgh v. F.P.C., 99 U.S.App.D.C. 113, 237 F.2d 741 (1956); Scenic Hudson Preservation Conference v. F.P.C., 354 F.2d 608 (2d Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966)
 
 
 [13]
 WAIT Radio v. F.C.C., 135 U.S.App.D.C. 317, 320, 418 F.2d 1153, 1156 (1969); City of Chicago v. F.P.C., 128 U.S.App.D.C. 107, 385 F.2d 629 (1967), cert. denied, 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968)
 
 
 [14]
 Johnston Broadcasting Co. v. F.C.C., 85 U.S.App.D.C. 40, 46, 175 F.2d 351, 357 (1949)
 
 
 [15]
 WAIT Radio v. F.C.C., 135 U.S.App.D.C. 317, 418 F.2d 1153 (1969); Pikes Peak Broadcasting Co. v. F.C.C., 137 U.S.App.D.C. 234, 422 F.2d 671, cert. denied, 395 U.S. 979, 89 S.Ct. 2134, 23 L.Ed.2d 767 (1969)
 
 
 [16]
 Braniff Airways v. C.A.B., 126 U.S.App.D.C. 399, 411-414, 379 F.2d 453, 465-468 (1967). The doctrine must be used gingerly, if at all, when basic procedural rights are at stake. Yiu Fong Cheung v. Immigration and Naturalization Service, 135 U.S.App.D.C. 244, 248, 418 F.2d 460, 464 (1969)
 
 
 [17]
 Colorado Interstate Gas Co. v. F.P.C., 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945); WAIT Radio v. F.C.C., 135 U.S.App.D.C. 317, 320, 418 F.2d 1153, 1156 (1969); Pikes Peak Broadcasting Co. v. F.C.C., 137 U.S.App.D.C. 234, 422 F.2d 671, cert. denied, 395 U.S. 979, 89 S.Ct. 2134, 23 L.Ed.2d 767 (1969)
 
 
 [18]
 Radio Station KFH Co. v. F.C.C., 101 U.S.App.D.C. 164, 247 F.2d 570 (1957)
 
 
 [19]
 Braniff Airways v. C.A.B., 126 U.S.App.D.C. 399, 379 F.2d 453 (1967); WAIT Radio v. F.C.C., 135 U.S.App.D.C. 317, 320, 418 F.2d 1153, 1156 (1969)
 
 
 [20]
 Niagara Mohawk Power Corp. v. F.P.C., 126 U.S.App.D.C. 376, 383 n. 24, 379 F.2d 153, 160 n. 24 (1967)
 
 
 [21]
 United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)
 
 
 [22]
 City of Chicago v. F.P.C., 128 U.S.App.D.C. 107, 116, 122, 385 F.2d 629, 638, 644 (1967); Am-Chi Restaurant, Inc. v. Simonson, 130 U.S.App.D.C. 37, 38, 396 F.2d 686, 687 (1968); Proctor v. Hackers' Board, 268 A.2d 267 (D.C.Ct.App.1970)
 
 
 [23]
 Joseph v. F.C.C., 131 U.S.App.D.C. 207, 211, 404 F.2d 207, 211 (1968)
 
 
 [24]
 Chicago B. & Q. Ry. v. Babcock, 204 U.S. 585, 598, 27 S.Ct. 326, 329, 51 L.Ed. 636 (1907)
 
 
 [25]
 Some instances of a principled use of luck, with ground rules known in advance, are cited in Star Television, Inc. v. F.C.C., 135 U.S.App.D.C. 71, 80 n. 18, 416 F.2d 1086, 1095 n. 18 (dissenting opinion), cert. denied, 396 U.S. 888, 90 S.Ct. 178, 24 L.Ed.2d 163 (1969)
 
 
 [26]
 City of Chicago v. F.P.C., 128 U.S.App.D.C. 107, 115, 385 F.2d 629, 637 (1967), cert. denied, 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968); Pinellas Broadcasting Co. v. F.C.C., 97 U.S.App.D.C. 236, 238, 230 F.2d 204, 206, cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956)
 
 
 [27]
 New Castle County Airport Comm'n. v. C.A.B., 125 U.S.App.D.C. 268, 270, 371 F.2d 733, 735 (1966), cert. denied, 387 U.S. 930, 87 S.Ct. 2052, 18 L.Ed.2d 991 (1967)
 
 
 [28]
 Marine Space Enclosures, Inc. v. F.M.C., 137 U.S.App.D.C. 9, 420 F.2d 577, 585 (1969); WAIT Radio v. F.C.C., 135 U.S.App.D.C. 317, 321, 418 F.2d 1153, 1157 (1969)
 
 
 [29]
 Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)
 
 
 [30]
 American Fed. of Television & Radio Artists v. N.L.R.B., 129 U.S.App.D.C. 399, 405, 395 F.2d 622, 628 (1968); Retail Store Employees Union, Local 400 v. N.L.R.B., 123 U.S.App.D.C. 360, 360 F.2d 494 (1965)
 
 
 [31]
 Oil, Chemical & Atomic Workers, etc. v. N.L.R.B., 124 U.S.App.D.C. 113, 116, 362 F.2d 943, 946 (1966); Lorain Journal Co. v. F.C.C., 122 U.S.App.D.C. 127, 131, 351 F.2d 824, 828 (1965), cert. denied, 383 U.S. 967, 86 S.Ct. 1272. 16 L.Ed.2d 308 (1966)
 
 
 [32]
 The Examiner put it that WHDH recognized that 'it would be unlikely to prevail under the conventional criteria.' 16 F.C.C.2d at 229, para. 721
 
 
 [33]
 The Commission said (par. 40):
 In closing, we think it should be made clear that our decision herein differs in significant respects from the ordinary situation of new applicants contesting with an applicant for renewal of license, whose authority to operate has run one or more regular license periods of 3 years. Thus, although WHDH has operated station WHDH-TV for nearly 12 years, that operation has been conducted for the most part under various temporary authorizations while its right to operate for a regular 3-year period has been under challenge. Not until late September 1962 did WHDH receive a license to operate its television station, and even then its license was issued for a period of 4 months only because of the Commission's concern with the '* * * inroads made by WHDH upon the rules governing fair and orderly adjudication * * *.' Again, unlike the usual situation when an applicant files for renewal of license, after WHDH filed its renewal application we issued an order directing that new applications for channel 5 would be accepted within a specified 2-month period. Such applications were filed, accepted, and entered into the proceeding herein. Those unique events and procedures, we believe, place WHDH in a substantially different posture from the conventional applicant for renewal of broadcast license.
 
 
 [34]
 22 F.C.C.2d 424 (1970)
 
 
 [35]
 'The policy statement is inapplicable, however, to those unusual cases, generally involving court remands, in which the renewal applicant, for sui generis reasons, is to be treated as a new applicant. In such cases, while the past record, favorable or unfavorable, is of course pertinent and should be examined, the WBAL policy, as here amplified, is inapplicable; a good record without serious deficiencies will not be controlling in such cases so as to obviate the comparative analysis called for in the 'Policy Statement on Comparative Broadcast Hearings,' 1 F.C.C.2d 393 (1965).' 22 F.C.C.2d at 430
 
 
 [36]
 See 29 F.C.C. 204, at 211-212:
 
 
 [5]
 However, we do conclude that Choate demonstrated an attempted pattern of influence. He indicates that his reason for the initial meeting with McConnaughey was to 'size up' the new Chairman but, accepting that as true as far as it goes, it does not appear to be a full disclosure of his motives. While the Herald-Traveler had a legitimate interest in the views of the new Chairman of the agency regulating its radio station and the television station it soon hoped to have, in the normal course of events its contacts with the Commission would be conducted through its professional representatives and its appraisal of the individual Commissioners would be formulated from the opinions of these gentlemen. The record contains no persuasive explanation of why Choate felt it necessary to seek a personal relationship with McConnaughey, and we conclude that his reason was to afford the Chairman an opportunity to 'size him up'; that is, to demonstrate by his demeanor and presence that he was a responsible man representing responsible interests who merited favorable consideration of their application to conduct an operation in the public interest
 
 
 [6]
 This view of Choate's motive in arranging the first luncheon is buttressed by the fact of the second luncheon and its admitted purpose of providing an opportunity to present McConnaughey with a brief on the Dempsey amendment. While WHDH undoubtedly had a right to express its views to the Commission on communications legislation concerning it, its attempted method of presentation must be judged in the light of the circumstances then prevailing. It could not have escaped Choate's attention that the subject of the legislation was an important issue in the pending adjudicatory proceeding, nor could he have believed that McConnaughey might read such a brief without perceiving the pertinence of its arguments to the disposition of the Boston case. If he felt it necessary to present such a brief to the Commission at that time, he must be presumed to have been aware of the relevance of the brief to the pending case, and, if he wished to escape the stigma of ex parte representation, the presentation should have been in such form as would afford his opponents an opportunity to make such reply as they might deem appropriate. Further, there is no persuasive explanation of why Choate, who is not shown to be a specialist in communications law, should consider himself, rather than the draftsman of the proposed legislation or some other experienced counsel, to be the proper person to present a brief on so technical and complex a subject. That McConnaughey did not accept and, therefore, could not have been influenced by the brief is irrelevant to the fact that Choate attempted, in effect to influence the outcome of the case by presenting argument on a portion thereof to a member of the Commission ex parte
 
 
 [7]
 The very attempt to establish such a pattern of influence does violence to the integrity of the Commission's processes. Such an attack on the integrity of the processes of any adjudicatory body brings into play its inherent right to protect such processes, and one of the remedial measures available is its discretion in the voiding of any previous action that may have been tainted by such attempt. The facts revealed on this record persuade us that the Commission's processes can best be protected in this instance by exercising our discretion to void the grant to WHDH
 
 
 [37]
 Algonquin Gas Transmission Co. v. F.P.C., 201 F.2d 334, 338 (1st Cir. 1953); Pennsylvania Gas and Water Co. v. F.P.C., 138 U.S.App.D.C. 298, 427 F.2d 568 (1970)
 
 
 [38]
 When an applicant is required to bear a demerit assigned for non-comparative reasons, the public may wind up being denied the services of a superior broadcaster. Where that demerit is not necessary for deterrent reasons, it would seem counterproductive. As to the final comparative hearing the blend of deterrence and public interest in selecting the broadcaster was accomplished by requiring WHDH to face a de novo comparative hearing, but without a continuing demerit
 
 
 [39]
 Cf. Office of Communications of United Church of Chrust v. F.C.C., 138 U.S.App.D.C. 112, 425 F.2d 543 (1969), especially at 551, for statement of Judges McGowan and Tamm, who along with Judge Burger, were on original panel, accompanying their vote to deny FCC petition for rehearing en banc
 
 
 [40]
 McClatchy Broadcasting Co. v. F.C.C. 99 U.S.App.D.C. 195, 239 F.2d 15 (1956), cert. denied, 353 U.S. 918, 77 S.Ct. 662, 1 L.Ed.2d 665 (1957); Scripps-Howard Radio, inc. F.C.C., 89 U.S.App.D.C. 13, 189 F.2d 677, cert. denied, 342 U.S. 830, 72 S.Ct. 55, 96 L.Ed. 628 (1951)
 
 
 [41]
 WIBC, Inc. v. F.C.C., 104 U.S.App.D.C. 126, 259 F.2d 941, cert. denied, 358 U.S. 920, 79 S.Ct. 290, 3 L.Ed.2d 239 (1958)
 
 
 [42]
 See, e.g., Justice Rutledge in Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); Judge Wright in Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 420 F.2d 597 (1969)
 
 
 [43]
 This was assigned on the ground that the ownership of Charles River by a charitable foundation implies limits on the amount of time which could be devoted to questions which may be related to legislation. Charles River says that its disability is unlike BBI's default since 'it is a relatively minor disentitlement, in view of the vast number of topics appropriate for editoralizing.' This court's affirmance is not to be taken as affirming the Commission's reasoning in assigning a slight demerit to Charles River, in the absence of guidance from the Internal Revenue Service, or consideration of to what extent, e.g., a fair and vigilant 'guest page' editorial policy of contrasting viewpoints might be acceptable to both the Service and the Commission
 Since this is an area that turns in substantial measure on guidelines and regulations of the Internal Revenue Service, the Commission would have had standing to seek authoritative guidance, on the record, from the Service. The fact that the Commission is an 'independent' agency in its decision-making does not mean that it may not properly be advised of pertinent policies under formation in the Executive Department.
 Indeed we see no reason why the Commission and Treasury could not have organized a conference on areas of mutual concern, to see whether the legislative intention underlying the Revenue Act could not be achieved by guidelines or regulations that did not unwittingly or unnecessarily result in an impairment of public interest under the Communications Act, which could include reasonable balance in service of the public.
 A Task Force of the first Hoover Commission recommended that the chairmen of the independent commissions be designated by the President from among the members, rather than determined by the members themselves, and assigned as an important consideration that this would facilitate legitimate channels of communication concerning interrelated policies without undercutting independence of action. Task Force Report on Regulatory Commissions (Appendix N), Prepared for The Commission on Organization of the Executive Branch of the Government, at 31-32 (1949).
 This recommendation (though not endorsed by the Hoover Commission) was followed in reorganization proposals that subsequently were proposed by the President, and became effective in the absence of legislative disapproval. The President now designates the Chairman for a majority of the independent regulatory commissions.
 Taking into account our 'collaborative' or 'partnership' kind of supervision of the agencies, we do not pursue the subject further at this time. It appears clear from the Commission's decision that any reconsideration or refinement of program proposals would be of minor consequence compared to the strong preference awarded BBI on the integration criterion.
 
 
 [44]
 Greater Boston (II), successor in interest to Greater Boston (I) (one of the competing applicants at the time of the disclosure of Mr. Choate's activities) has no serious basis to challenge the conclusion that BBI would better serve the public interest. The Hearing Examiner endorsed the rebuttal in BBI's brief of the Greater Boston (II) application. One sentence sums it up: 'Their interest in television may have been long but so far as this recore reflects, it has never been deep.' 16 F.C.C.2d at 258
 We see no ground for holding that this appellant had a right to confine the Commission to consideration on the basis of the original record and to resist a fresh, comparative hearing.