590 F.2d 1187
 192 U.S.App.D.C. 71
 COMMONWEALTH OF PENNSYLVANIA and Pennsylvania Public Utility
Commission, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Consolidated Rail Corporation, Corning Glass Works &
Thatcher Glass Manufacturing Co., Intervenors.
 No. 77-1147.
 United States Court of Appeals,
District of Columbia Circuit.
 Submitted Without Oral Argument March 16, 1978.
Decided Dec. 21, 1978.
 
 Gordon P. MacDougall, Washington, D. C., was on the brief, for petitioners.
 Mark L. Evans, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, Walter H. Walker, III, Atty., I. C. C., John H. Shenefield, Acting Asst. Atty. Gen., and Peter de la Cruz, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondents.
 John R. Bagileo, Washington, D. C., was on the brief, for intervenor Corning Glass Works, et al.
 John A. Daily and Richard J. Murphy, Philadelphia, Pa., were on the brief for intervenor, Consolidated Rail Corp.
 Before McGOWAN, MacKINNON and WILKEY, Circuit Judge.
 Opinion of the Court filed by MacKINNON, Circuit Judge.
 MacKINNON, Circuit Judge:
 
 
 1
 The Interstate Commerce Commission (ICC or the Commission) has issued an order approving a proposed tariff of the Consolidated Rail Corporation (ConRail) which cancels that railroad's Piggy-Back Service (Trailer-On-Flat-Car-Service (TOFC)) to twenty-four previously operating TOFC terminals. The Commission evaluated the proposed tariff under 49 U.S.C. § 1(4), (6)[1] and determined that ConRail was entitled to discontinue its Trailer services to these terminals as no "reasonable request" for their continuation had been advanced.[2] Petitioners do not challenge the factual basis for the Commission's order, but rather only the criteria it applied in weighing the evidence presented. As we find that the standard adopted by the ICC was reasonable, within its statutory authority and not inconsistent with its previous decisions in similar cases, we affirm the Commission's order in its entirety.
 
 I. THE FACTS
 
 2
 ConRail was established pursuant to the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 Et seq., with the purpose of "reorganization of the railroads, stripped of excess facilities, into a single, viable system operated by a private, for-profit corporation." Regional Rail Reorganization Act Cases, (Blanchette v. Connecticut General Ins. Corps.), 419 U.S. 102, 109, 95 S.Ct. 335, 342, 42 L.Ed.2d 320 (1974). To undertake the planning necessary to implement such reorganization of a number of bankrupt railroads, Congress established the United States Railway Association (USRA), 45 U.S.C. § 711, charged with developing a "Final System Plan" for restructuring the northeastern railroads, 45 U.S.C. § 716.
 
 
 3
 The Final System Plan was published in due course by the USRA in July 26, 1975, and supplemented on September 18 of the same year. This Plan transferred approximately 70% Of the lines of six northeastern railroads[3] to ConRail and referred specifically to the necessity of restructuring the Trailer service offered by these bankrupt lines.[4]
 
 
 4
 On April 1, 1976, ConRail commenced common carrier operations, having filed its Tariff No. 1 in which it proposed to cancel trailer service to 31 ramps previously serviced by the railroads from which ConRail had been constituted. On March 22, 1976, the Commonwealth of Pennsylvania (Pennsylvania) and the Pennsylvania Public Utility Commission filed a protest and petitioned for suspension of the proposed cancellation of TOFC service with the ICC. Many similar protests were filed by parties concerning other TOFC ramps where ConRail planned to terminate service. On March 31, the Commission, Division 2, suspended 27 of ConRail's proposed TOFC cancellations until October 31, 1976, and ordered an investigation into the lawfulness of ConRail's proposals, I & S Docket No. 9108.[5] It is undisputed that all such investigation proceedings after February 5, 1976 are governed by 49 U.S.C. § 15(8)(a). This provision of the Railroad Revitalization and Regulatory Reform Act of 1976 requires that when the Commission investigates a proposed change in a railroad's tariff it shall render a final decision within 7 months of the date that the change was scheduled to become effective.[6]
 
 
 5
 Oral hearings were held in the TOFC investigation on May 26 and 27[7] and briefs were submitted by participating parties. The ICC, Division 2, served and published its Report and Order on October 29, 1976, two days before the expiration of the statutory seven month period.[8] It found that cancellation of TOFC service to or from 24 of the originally proposed 31 terminals had been shown to be just and reasonable. Included among these 24 terminals were Sharon and Reading, Pennsylvania and Elmira, New York. ConRail thereupon ceased Trailer service to these points. On November 24, Pennsylvania filed a "petition for reconsideration" of the order of October 29 requesting the resumption of service to Sharon and Reading. This Petition for Reconsideration was within the 30 day period provided for such petitions by Commission regulations.[9] Corning Glass Works and Thatcher Glass Manufacturing Company also filed similar petitions with respect to the cancellation of the Elmira service and also on December 27,[10] filed petitions for review of the ICC's order in this court, Docket No. 76-2153.
 
 
 6
 The Commission denied both of these "petitions for reconsideration" by its order of February 2, 1977 in I & S No. 9108 (complaint).[11] The ICC stated in this order that due to the seven month time limit established in 15(8)(a), the October 29 order was statutorily and administratively final. Thus, by statute, the Commission asserted that it was precluded from acting on petitions for reconsideration and it was likewise precluded from reversing itself on reconsideration sua sponte.[12] Accordingly, it elected to treat the petitions in question as new "complaints" within the meaning of 15(8)(a).[13]
 
 
 7
 Acting on these "new complaints" the Commission granted Corning and Thatcher's complaint that termination of the Elmira service was unlawful. However, it dismissed Pennsylvania's complaint by discontinuing the proceeding on the ground that it could not take any further action on its "Final decision."
 
 
 8
 On February 3, Pennsylvania and the Pennsylvania Public Utility Commission (Utility Commission) filed a petition for review in this court, Docket No. 77-1147 and at the same time intervened in No. 76-2153, the action filed on December 27 by Corning and Thatcher. On February 18, however, Corning and Thatcher moved to dismiss No. 76-2153 on the grounds that the relief that they were seeking had been granted by the Commission's decision to restore service to Elmira (ConRail had resumed TOFC service to Elmira on February 15, 1977). Pennsylvania and the Utility Commission opposed this motion to dismiss because, as more than sixty days had elapsed between the October 29th order and their filing for judicial review, dismissing No. 76-2153 might cause the court to lose jurisdiction over 77-1147 according to the I.C.C.'s interpretation of 28 U.S.C. § 2344.[14] This court, however, granted the motion to dismiss and denied a petition for rehearing on that ruling on April 28, 1977. On June 16, the petitioners filed their opening brief in 77-1147. ConRail and Corning Glass and Thatcher Manufacturing were permitted to intervene.
 
 II. JURISDICTION
 
 9
 As a threshold issue, the ICC raises a challenge to the jurisdiction of this court. This challenge is based on the Commission's interpretation of two statutes. 49 U.S.C. § 15(8)(a)[15] requires that the Commission issue a "final decision" on the reasonableness of proposed tariffs no later than seven months after their scheduled effective date. 28 U.S.C. § 2344[16] (the Hobbs Act) specifies that "any party aggrieved by a final order (of an Agency) may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies." The ICC contends that since Pennsylvania and the Utility Commission did not file for review within sixty days of the ICC order of October 29, they are barred by the Hobbs Act from being heard in this court.[17] Petitioners, on the other hand, argue that the 60 day period provided for by the Hobbs Act was tolled until the Commission disposed of their Petition for Reconsideration. The ICC acknowledges that usually a party has sixty days from the denial of a Petition for Reconsideration to file for judicial review, but insists that the requirement embodied in 49 U.S.C. § 15(8)(a) that a "final decision (be) rendered" not later than 7 months after the scheduled effective date supercedes the usual review procedures.
 
 
 10
 The jurisdictional argument raised by the Commission is sufficiently surprising that it is worth summarizing what it considers to be the basic issue raised by the timing of the various petitions for review and reconsideration presented in this case. Pennsylvania complied with all the time limits applicable in the usual case of obtaining judicial review of administrative action in that it filed for reconsideration by the agency within the prescribed 30 day period and for judicial review within the sixty days prescribed by the Hobbs Act from the date of the denial of the petition for reconsideration. Respondents, however, argue that petitioners' suit should be barred as untimely. The Commission maintains that 15(8)(a) changed the normal review procedure by foreclosing All possibility of further agency review after the lapsing of the seven month period. Thus, because the Commission's order in this case was issued at the very end of this period, it necessarily became the agency's final order, without possibility of reconsideration.
 
 
 11
 Accordingly, the Commission argues that the sixty day period of the Hobbs Act began to run, not from the date of the disposition of the Petition for Reconsideration but from the earlier date of the issuance of the original order embracing the "final decision." The Commission, however, does an end run around its construction of the statute by treating what it terms an untimely petition for review as a new "complaint" because it deemed itself barred by 15(8)(a) from following its normal procedure of giving further consideration to its order upon a petition for reconsideration.[18]
 
 
 12
 We readily agree that time limitations for seeking judicial review of agency orders are jurisdictional, Fed.R.App.P. 26(b); Microwave Communications, Inc. v. F.C.C., 169 U.S.App.D.C. 154, 157-158, 515 F.2d 385, 388-389 (1974), so that had petitioners in fact been tardy in seeking review we would be required to dismiss the case. We cannot, however, concur in the Commission's construction of 49 U.S.C. § 15(8)(a). Petitions for reconsideration are a basic feature of administrative decision making and explicitly provided for in the Interstate Commerce Act, See Guandolo, Transportation Law 970 (1973); 1 Davis, Administrative Law 602 (1958); 49 U.S.C. § 17(6), and "(a) general notion (is that) . . . an administrative order is not 'final,' for purposes of judicial review, until outstanding petitions for reconsideration have been disposed of," Civil Aeronautics Board v. Delta Air Lines, 367 U.S. 316, 326, 81 S.Ct. 1611, 1619, 6 L.Ed.2d 869 (1961); See, e. g., Tallman v. Udall, 116 U.S.App.D.C. 379, 324 F.2d 411, 416 (D.C. Cir. 1963); Montship Lines v. Federal Maritime Board, 111 U.S.App.D.C. 160, 295 F.2d 147 (1961); Outland v. Civil Aeronautics Board, 109 U.S.App.D.C. 90, 284 F.2d 224 (1960); Braniff Airways, Inc. v. Civil Aeronautics Board, 79 U.S.App.D.C. 341, 147 F.2d 152 (1945); Cf. American Farm Lines v. Black Ball, 397 U.S. 532, 541, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). The ICC's argument hinges on its position that Congress intended in section 15(8)(a), solely with respect to the ICC, to alter the usual practice of filing for judicial review only after administrative reconsideration has been denied. An order "final" for purposes of 15(8)(a) should, the ICC asserts, be treated as "final for purposes of the Hobbs Act as well[19] because by 15(8)(a) Congress meant to foreclose the ICC from further consideration even on petitions for reconsideration of the tariffs submitted to it. We view this provision, however, as merely intending to require the Commission to act with sufficient promptness so that the railroad could place the tariff into effect within a reasonable period or begin its normal procedures to test the Commission's ruling. The last sentence of § 15(8)(a) which provides "Such rate, fare, charge, classification, regulation or practice may be set aside thereafter by the Commission if, upon complaint of an interested party, the Commission finds it to be unlawful" was merely intended to authorize Other parties to attack the Commission's ruling on various tariffs by subsequent complaints.
 
 
 13
 In enacting 15(8)(a) Congress was undoubtedly concerned to speed up the often dilatory deliberations of the ICC.[20] Accordingly, the Commission's suggestion that Congress meant to require it to act definitively within seven months and did not intend this time limit to be subject to extension by the pendency of petitions for reconsideration has some cogency. Upon analysis, however, to consider the "final decisions" within 7 months required by § 15(8)(a) as entailing "finality" for purposes of the Hobbs Act seems clearly mistaken.
 
 
 14
 15(8)(a) was designed to speed up the consideration of tariffs by providing that within seven months of their proposed effective dates, Commission action on suspended tariffs must become "final" under penalty of having tariffs go into effect in their original form. Section 15(8)(a) reflects such a purpose on its face, and specific allusions abound in the Committee reports to the "excessive regulatory delay" and "wasteful and time-consuming" regulatory practices at the Commission.[21] We conclude, consonant with this legislative history, that any petition for reconsideration that may be filed in regard to a Commission ruling under 15(8)(a) should not interfere with the finality in the sense of Effectiveness of a tariff after the expiration of the seven months period. It is, however, a far cry from reaching this conclusion to accepting the Commission's jurisdictional argument.
 
 
 15
 That tariffs must become effective within seven months does not mean that the Commission, without further suspending such effectiveness, cannot entertain a proper petition for reconsideration after this time. The October 29 order was "final" despite the filing of a petition for reconsideration in the sense of being operative in allowing the proposed cancellation of TOFC service by ConRail to become effective.[22] The petition for reconsideration thus did not deprive the Commission's decision of its quality as a final order in the sense of effectiveness, but there is no justification for holding that its failure to toll the effectiveness of the tariff also involved a failure to toll the sixty day period within which a petition for review under the Hobbs Act must be filed.
 
 
 16
 As mentioned above, the legislative history of the Railroad Revitalization Act explicitly refers to reducing the delays caused by the Commission's deliberations. There is no indication, however, that Congress considered it advisable to force the expedition of judicial review[23] of the Commission orders by requiring petitions for reconsideration to be filed within the seven months prescribed by 15(8)(a) or not allowing the pendency of such a petition to toll the running of the Hobbs Act period even after the expiration of seven months. It would be surprising were there any evidence of such a legislative purpose, as nothing would be gained by precluding the ICC from considering petitions for reconsideration or refusing to toll the Hobbs Act period while it was doing so. Administrative reconsideration is a more expeditious and efficient means of achieving an adjustment of agency policy than is resort to the federal courts, and it is hard to see why a Congress concerned to hasten the process of implementing new railroad tariffs would have wanted to restrict the availability of this avenue of appeal.
 
 
 17
 If it had been the intention of Congress absolutely to preclude administrative consideration of tariffs after the running of the seven month time period the only legislative purpose consistent with the Commission's position the Reorganization Act would hardly have provided explicitly for a complaint procedure whereby Any "interested party" may challenge effective tariffs as unlawful. The last sentence of § 15(8)(a) specifies that after the seven month period has elapsed a tariff may only thereafter be set aside "if, upon complaint of an interested party, the Commission finds it to be unlawful."[24] Parties who initially file protests qualify as "interested parties"[25] and as Congress thus obviously did not mean to limit them to agency consideration during the seven month period, it is difficult to see why it would wish to foreclose consideration of timely petitions for reconsideration after this period. It is hardly "streamlining" procedures to require litigating parties to open up a New proceeding, to obtain agency reconsideration of a decision which it has just announced. The manner in which the ICC acted on the new "complaints" in this proceeding clearly indicates that such action would have been handled with less complication on a petition for reconsideration.
 
 
 18
 On its face the final proviso of 15(8)(a) appears only explicitly to establish a possibility of obtaining administrative review of a tariff after it has gone into effect. The Commission, however, both in this case and in its notice of changes in practices issued on January 28, 1977[26] imaginatively interprets this language to mean that petitions for reconsideration must be treated as complaints after the seven month period has expired. There is nothing in the statutory language or the legislative history that makes even an indirect allusion to transforming petitions for reconsideration of agency decisions into new complaints. In fact, no reference appears in any context to petitions for reconsideration. We are thus unwilling to accede to an agency construction that would alter a long-standing practice in administrative review that is neither referred to in the statutory language nor alluded to in Congressional reports or debate. Section 15(8)(a) is silent concerning such petitions and we interpret this silence as supporting the interpretation that Congress did not intend to change the established practice with respect to such motions.
 
 
 19
 In light of the unusual interpretation by the Commission of the complaint proviso of 15(8)(a) and the inconsistency of this position with past administrative practice, we would require the ICC to produce a forceful argument in order to prevail. Significantly, neither ConRail nor the Commission is able to produce any concrete support for their position. Respondents go no further in defending their position than to cite the "plain meaning of the statute"[27] and to attempt to distinguish various cases tending to support petitioner's contention that the Hobbs Act period is tolled pending resolution of a petition for reconsideration.[28] Intervenor ConRail makes much of the legislative history's unmistakable emphasis on streamlining the operations of the ICC,[29] but this argument as explained above is of little force.[30]
 
 
 20
 The Commission seems to concede that "policy arguments" might not support its interpretation of the statute, but insists that "policy considerations cannot be permitted to override the express statutory requirements of Section 15(8)(a)."[31] As we find the intent of these "express statutory requirements" to be quite different from those that the Commission perceives, we have no difficulty accommodating the pertinent "policy considerations" to the terms of 15(8)(a), nor in determining that this court does indeed have jurisdiction to review the ICC order in question as the petition for review of this order was filed in a timely manner within sixty days of the dismissal of the petition for reconsideration.[32]
 
 III. THE VALIDITY OF THE COMMISSION'S ORDER
 
 21
 Petitioners' argument for the invalidity of the Commission's order is unusual in that it explicitly does not "reach the evidentiary issue."[33] They do not deny that the Commission's findings were based on substantial evidence, rather petitioners maintain that in arriving at a conclusion from these findings, the ICC applied improper criteria.[34] Due to the nature of petitioners' approach, it is not necessary for us to look beyond the face of the standards invoked by the Commission. So viewed, we see no alternative but to affirm the Commission's decision.
 
 
 22
 Pennsylvania and the Utility Commission advance essentially two different arguments in seeking to invalidate the Commission's order. First, they allege that the balancing standard applied in this case differed from that applied in previous similar decisions, and that the ICC has failed to explain the discrepancy.[35] More substantively, petitioners insist that the Commission could not make a finding that, on balance, there had been no "reasonable request" for TOFC service at Sharon and Reading without first making a finding that the TOFC service at these ramps had been operating at a deficit.[36] Both these arguments are without merit.
 
 
 23
 Concerning the alleged discrepancy with past agency decisions, we agree that were there such a discrepancy, it would indeed have to be explained, or the Commission's decision could not be affirmed, Greyhound Corp. v. I.C.C.,179 U.S.App.D.C. 228, 230, 551 F.2d 414, 416 (1977); Greater Boston T.V. v. F.C.C., 143 U.S.App.D.C. 383, 396, 444 F.2d 841, 852 (1970), Cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). We do not, however, find that the Commission has made any significant departure in this case from its past approach in dealing with service terminations. In arriving at its conclusion, the Commission explicitly referred to the two previous decisions, Livestock, South, Southwest, Central, and Western Territories, 346 I.C.C. 418 (1974) (Livestock ) and Icing Services, U.S. Railroads, 343 I.C.C. 67 (1973) (Icing ) with which the petitioners claim its present determination is at variance.[37] Through a consideration of Livestock and Icing, the Commission determined that a balancing test was the appropriate standard to be applied in this case. In Icing and Livestock, although only the latter specifically alluded to a balancing test,[38] the Commission in both cases clearly proceeded by weighing the interests of the shippers against those of the carriers.[39] In the present proceeding, the Commission defined its inquiry as involving just such a balancing test:
 
 
 24
 (The Commission's responsibility is) to seek a proper balance between the interests of the individual shippers and communities, on the one hand, and those of the carrier on the other. On the user side we will address reliance, past and present, on these services, the prospective need for service, proximity of comparable alternative service, and the cost and convenience of alternative service. As to the carrier interests involved, we will look to the financial and operational burden of continuing service, the likelihood that continuing service will be consistent with the carrier's prior holding out to perform the service, see I.C.C. v. Oregon-Washington R. Co., 288 U.S. 14 (53 S.Ct. 266, 77 L.Ed. 588) (1932), and whether an order to continue service would be an undue or stifling interference with reasonable efforts to conduct an economically viable operation. In balancing these competing interests and shifting the opposing claims we should be able to identify reasonable requests for service which Conrail must, by law, respond to.[40]
 
 
 25
 There is no question that some of the factors involved in the balancing tests applied in Livestock and Icing differed from those applicable in this case. In fact, the Commission explicitly alluded to the fact that in Livestock and Icing it was confronted with the phasing out of admittedly obsolete services rather than, as here, with the reduction of inefficient stations of a service with considerable potential for growth.[41] That somewhat different factual contexts were involved does not, however, mean that the Commission's approach was different in these three cases. The difference in the results reached by the Commission is the natural result of the different factual situations that were presented. It by no means indicates an abrogation of reasoned analysis for pure administrative caprice, Greater Boston T.V. v. F.C.C., supra, 143 U.S.App.D.C. at 396, 444 F.2d at 852, nor an alteration in the I.C.C.'s basic policies and approach.[42] This circuit "emphatically requires that administrative agencies adhere to their own precedents or explain deviations from them," Greyhound v. I.C.C., supra, 179 U.S.App.D.C. at 230, 551 F.2d at 416,[43] but the numerous different factors specifically discussed by the Commission[44] in this case are more than sufficient to justify the difference in result between its decision here and in Icing and Livestock.
 
 
 26
 The contention that petitioners advance most strenuously, however, is not that the Commission acted inconsistently with previous practice. Their chief point is rather that ConRail, which has the burden of justifying the cancellation of existing services,[45] had not made out a prima facie case that Pennsylvania's request for continued TOFC service was "unreasonable" because it had not shown that the TOFC operations at Sharon or Reading ran at a deficit.[46] The petitioners insist that a showing of an operating deficit is necessary because ConRail must meet a higher standard, due to its obligations under § 1(4),[47] than merely demonstrating that the carrier's interest in terminating TOFC service outbalanced the public's interest in the continuance.[48] Asserting that the Final System Plan did not specifically suggest curtailment of piggy-back service,[49] Pennsylvania argues that "a reduction in cost and improvement in efficiency do not substitute for a showing of losses under the existing arrangement."[50] It contends that as a prerequisite for cancellation, ConRail must show the unprofitability of TOFC operations at the specific ramp slated for termination[51] and that without such a showing the application of the customary balancing test is inappropriate.[52]
 
 
 27
 We find petitioners' position wholly untenable. In light of the clear emphasis of the Final System Plan on the importance of culling away Inefficient routes from the Northeast rail system,[53] there is simply no basis for asserting that even if a cancellation would contribute to the greater efficiency and economic viability of ConRail that this cancellation should nevertheless be prohibited if the depot terminated had not itself been losing money.
 
 
 28
 Respondents do not seek to disavow ConRail's responsibility under 1(4) of the Interstate Commerce Act to provide service upon "reasonable request,"[54] and railroads under this section clearly owe the public "reasonable efforts" to maintain the services they seek to terminate, Livestock, supra, 446 I.C.C. at 435. The duty to provide services is not, however, absolute, E. g., Livestock, supra, 446 I.C.C. at 435, and one should be extremely hesitant before establishing any absolute prerequisites for service cancellation. Whether or not the TOFC operation at Sharon or Reading was itself unprofitable,[55] the circumstances which might in the past have justified providing this service to these stations were changed considerably in light of the creation and purposes of ConRail. Given the objective of Congress to allow ConRail to reorganize and restructure the Northeastern railroad lines,[56] we would not be justified in limiting the company's ability reasonably to adjust its routes by insisting that every previously operating ramp at which service was to be terminated must be shown to be individually unprofitable. The loss test advocated by Pennsylvania would regard each station as a self-contained microcosm and blind itself to the broader public interest in increasing the efficiency of ConRail. It is an over narrow view of the decision making authority vested by Congress in the ConRail management[57] and the I.C.C.[58] to require that service termination cannot be considered unless actual loss is demonstrated.
 
 
 29
 Petitioners cite no authority whatsoever for their view that a loss must be shown before termination of service can be approved,[59] nor is there likely to be any precedent for this position. Where other factors suggest significant justification for terminating a service ramp, profitability alone should not preclude such a step. For example, in this case, although the Final System Plan anticipated a major increase in such "intermodal rail traffic" as TOFC and considered this increase as an important element on ConRail's hopes for success,[60] both Sharon and Reading showed little chance for any meaningful increase in such traffic.[61] Furthermore, having to maintain the availability of these ramps might well have forced ConRail to continue inconvenient, or at least non-optimal, car-allocations and routings. The ICC expressly found that "although there is no reliable quantification of dollar savings that will be achieved by the ConRail proposal, there is ample evidence that ConRail's costs will be reduced and its TOFC operation made more efficient and more competitive with motor carrier service" by the elimination of "a number of the smaller TOFC ramp facilities."[62]
 
 
 30
 Given such findings, which petitioners do not deny are supported by substantial evidence, it would be highly unreasonable to insist that cancellation of an individual ramp was not possible unless specific financial loss was demonstrated. We do not, of course, assert that the profitability of a given ramp is irrelevant to the termination decision. We do, however, feel that in this case where exact profit and loss figures were difficult to determine[63] and there was clear Congressional emphasis on efficiently reorganizing the rail services in question the Commission was fully justified in deciding that even if the stations involved were individually profitable to some extent, ConRail was justified in terminating them.
 
 
 31
 Finding that the Commission's analysis in the instant case was in accord rather than at variance with its prior decisions, and that unprofitability need not be established before service at a given ConRail terminal may be cancelled, we affirm the Commission's order in its entirety.
 
 
 32
 So ordered.
 
 
 
 [1]
 Investigation and Suspension Docket No. 9108 at 35:
 In this proceeding, satisfaction of ConRail's statutory burden of proof turns on an examination of the cancellation in light of ConRail's responsibility under section 1(4) of the act to provide and furnish transportation upon reasonable request therefor. A failure to satisfy its section 1(4) responsibilities would constitute an unreasonable practice under section 1(6) of the act.
 
 
 [2]
 Id. at 39-40
 
 
 [3]
 The Penn Central, Central Railroad Co. of New Jersey, Lehigh Valley Railroad Company, Lehigh and Hudson River Railway Company, Erie Lackawanna Railroad Company, and Reading Company
 
 
 [4]
 Brief for Intervenor ConRail at 4
 
 
 [5]
 See note 1, Supra
 
 
 [6]
 49 U.S.C. § 15(8)(a) was enacted as section 202(e)(2) of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. 94-210, 90 Stat. 37, and provides:
 (8)(a) Whenever a schedule is filed with the Commission by a common carrier by railroad stating a new individual or joint rate, fare, or charge, or a new individual or joint classification, regulation, or practice affecting a rate, fare, or charge, the Commission may, upon the complaint of an interested party or upon its own initiative, order a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice. The hearing may be conducted without answer or other formal pleading, but reasonable notice shall be provided to interested parties. Such hearing shall be completed and a final decision rendered by the Commission not later than 7 months after such rate, fare, charge, classification, regulation, or practice was scheduled to become effective, unless, prior to the expiration of such 7-month period, the Commission reports in writing to the Congress that it is unable to render a decision within such period, together with a full explanation of the reason for the delay. If such a report is made to the Congress, the final decision shall be made not later than 10 months after the date of the filing of such schedule. If the final decision of the Commission is not made within the applicable time period, the rate, fare, charge, classification, regulation, or practice shall go into effect immediately at the expiration of such time period, or shall remain in effect if it has already become effective. Such rate, fare, charge, classification, regulation, or practice may be set aside thereafter by the Commission if, upon complaint of an interested party, the Commission finds it to be unlawful. (Emphasis added).
 15(8)(a) thus provides that a final decision shall be rendered within 7 months, or ten months if the Commission files a report to Congress explaining why it has been unable to act within the shorter time limit. No such report was filed in this case and the possibility of a Commission requested extension is not an issue. Accordingly, for convenience's sake, the time period established for Commission action under 15(8)(a) will be referred to simply as "the seven month period."
 By altering its tariff so as to omit any rate for TOFC service from the terminals in question, ConRail thereby cancelled TOFC service at such terminals.
 
 
 [7]
 At this hearing only one user of TOFC service in the Commonwealth of Pennsylvania, Wheatland Tube Company, appeared. Wheatland used the Sharon, Pa. depot one of the ramps at which petitioners seek to have TOFC service restored
 
 
 [8]
 An initial decision by the Administrative Law Judge who presided over the hearings held in connection with I. & S. No. 9108 was never rendered due to the time pressure imposed by the seven month limitation established by 15(8)(a)
 
 
 [9]
 The Commission's procedure at the time allowed a 30 day period after the entry of a Commission order to move for reconsideration. 49 U.S.C. § 17(6) Specifically authorizes "any party" to a decision of a division to apply for rehearing and at the time the subject decision was rendered by Division 2 on October 29, 1976 the applicable ICC Regulation, 49 C.F.R. 1100.101(a)(3), (e) (1976), Infra, authorized the filing of a petition for reconsideration within 30 days "where the initial decision is made by a division . . ." Accordingly such petition was filed on November 24, 1976. The applicable statute and regulation follow:
 (6) After a decision, order, or requirement shall have been made by the Commission, a division, an individual Commissioner, or a board, or after an order recommended by an individual Commissioner or a board shall have become the order of the Commission as provided in paragraph (5) of this section, any party thereto may at any time, subject to such limitations as may be established by the Commission as hereinafter authorized, make application for rehearing, reargument, or reconsideration of the same, or of any matter determined therein. Such applications shall be governed by such general rules as the Commission may establish.
 Rehearing, reargument, or reconsideration may be granted if sufficient reason therefor be made to appear; but the Commission may, from time to time, make or amend general rules or orders establishing limitations upon the right to apply for rehearing, reargument, or reconsideration of a decision, order, or requirement of the Commission or of a division so as to confine such right to proceedings, or classes of proceedings, involving issues of general transportation importance.
 49 U.S.C. § 17(6).
 (3) Limitations on petitions for review of division decisions. Pursuant to authority granted in section 17(6) of the Interstate Commerce Act, the right to apply to the entire Commission for rehearing, reargument, or reconsideration of a decision, order, or requirement of a division of the Commission in any proceeding shall be limited and restricted to those proceedings in which the entire Commission, on its own motion, determines and announces that an issue of general transportation importance is involved. In proceedings in which no such announcement has been made, but in which a division reverses, changes, or modifies a prior decision by a hearing officer or Where the initial decision is made by a division, a petition to the same division for rehearing, reargument, or reconsideration of its decision will be permitted and will be considered and disposed of by such division in an appellate capacity and with administrative finality. (Emphasis added)
 
 
 [49]
 C.F.R. § 1100.101(a)(3) (1976)
 (e) Time for filing. Except for good cause shown, and upon leave granted, petitions under this section must be filed within 30 days after the date of service of a decision or order, except as otherwise provided in the special rules of practice.
 
 
 [49]
 C.F.R. § 1100.101(e) (1976)
 
 
 [10]
 Thatcher and Corning's petition to this court for judicial review was, thus, filed within the sixty day period following the entry of an administrative order which the Hobbs Act prescribes for filing for judicial review
 
 
 [11]
 Petitioners' Brief at App. 44-51
 
 
 [12]
 I. & S. Docket No. 9108 (Complaint) at 1-2; Petitioners Brief at App. 44-45
 
 
 [13]
 Id. at 2; Petitioners' Brief at App. 45
 
 
 [14]
 Although the petitioners in this case were clearly concerned over the possible jurisdictional argument that the Commission might raise, they did not refer to it at all in their main brief
 
 
 [15]
 See note 6, Supra
 
 
 [16]
 28 U.S.C. § 2344 provides:
 On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by a final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States.
 
 
 [17]
 Respondent's Brief at 20; ConRail also stresses this point, Brief for Intervenor ConRail at 10-15
 
 
 [18]
 Respondent's Brief at 15. After considering Pennsylvania's Petition for Review as a new "complaint" the Commission denied Pennsylvania relief. In restoring service to Elmira, N.Y. on the basis of Corning and Thatcher's complaint, the Commission explicitly relied on new evidence that these parties produced, I. & S. Docket No. 9108 (Complaint) at 2; Petitioners Brief at App. 45
 
 
 [19]
 That the term "final" occurs in both statutes is of little significance. The Supreme Court has specifically asserted that this term may have different meanings in different contexts, Civil Aeronautics Board v. Delta Airlines, 367 U.S. 316, 326, 81 S.Ct. 283, 5 L.Ed.2d 258 (1961)
 
 
 [20]
 See note 21, Infra
 
 
 [21]
 2 Cong. & Admin. News 15 (1976); Id. at 29; See also Id. at 149 ("needless or harmful regulatory constraints on railroads"). An entire Title of the Railroad Revitalization and Regulatory Reform Act of 1976 was devoted to ICC Improvements. See also Id. at 148 ("(the Act) makes extensive reforms of the Commission's hearing and appellate procedure, including provision that impose deadlines for commission actions and that permit a streamlined decisionmaking procedure in certain circumstances . . .")
 
 
 [22]
 See Petitioner's Reply Brief at 5
 
 
 [23]
 A considerable part of the Railroad Revitalization and Regulatory Reform Act of 1976 dealt with administrative reform, See note 21, Supra, but no reference was made to any need to expedite the process of Judicial review
 
 
 [24]
 See note 6, Supra
 
 
 [25]
 Petitioners themselves were obviously deemed eligible to file a complaint as the Commission considered their petition for reconsideration to be in effect a complaint. See note 18, Supra
 
 
 [26]
 Notice of Procedural Requirements to be Observed by All Parties to Commission Proceedings Involving Railroad Rate Changes, 42 Fed.Reg. 6450 (January 28, 1977)
 
 
 [27]
 Respondents' Brief at 23-24
 
 
 [28]
 Id. at 21-23. The cases distinguished were State of New York v. United States, 568 F.2d 887 (2d Cir. 1977) and B. J. McAdams, Inc., v. Interstate Commerce Commission, 551 F.2d 1112 (8th Cir. 1977). The Respondents cite in support of their argument the case of Provisioners Frozen Food Express v. Interstate Commerce Commission, 536 F.2d 1303 (9th Cir. 1976). This latter case is inapposite, however, in that it decided only that a second motion for "reopening" filed after an earlier such motion had been denied, both such motions having been brought After the Commission denied reconsideration did not toll the Hobbs Act period
 
 
 [29]
 Brief for Intervenor ConRail at 11-13; See note 21, Supra
 
 
 [30]
 As an order of the Commission is effective despite the pendency of petitions for reconsideration, it is also reviewable in court without need of first filing such petitions, 5 U.S.C. § 704. Thus, there is no support for the Commission's view in the suggestion that Congress wanted to allow railroads to obtain judicial review of I.C.C. tariff orders as soon as feasible
 
 
 [31]
 Respondent's Brief at 23-24
 
 
 [32]
 Because we find the Commission's jurisdictional argument to be without merit, we do not reach the question of whether or not the Commission gave sufficient notice of the change in its practice in regards to petitions for reconsideration which it felt compelled to adopt by its interpretation of 15(8) (a), See Petitioners' Reply Brief at 5-6. The Commission has not made its interpretation of the effect of 15(8)(a) clear except insofar as it claims that this statute bars the instant suit. What the Commission's interpretation would be if a petition for reconsideration were filed before the seven month period expired or if such a petition were filed but the Commission did not dispose of it until the seven month period, has not been elaborated. Since, however, we hold that the Hobbs Act period was tolled during the pendency of a petition for reconsideration even though it was filed After the passage of the seven month period, A fortiori when such a petition is filed before this time limit, the petitioner will have sixty days to file for judicial review after the disposition of this motion for reconsideration
 
 
 [33]
 Petitioners' Brief at 8
 
 
 [34]
 Id. ("Only when the ICC passes upon the issues under the requisite legal guidelines can the court then apply the substantial evidence test.")
 
 
 [35]
 Id
 
 
 [36]
 Id. at 10-11
 
 
 [37]
 I. & S. No. 9108 at 36
 
 
 [38]
 Livestock, South, Southwest, Central, and Western Territories, 346 I.C.C. 418, 438 (1974) (". . . the needs of the public must be balanced against the cost to the railroad to comport with the national transportation policy and other provisions of the Interstate Commerce Act.")
 
 
 [39]
 Similarly, in the rail line abandonment case cited by petitioners, Missouri Pacific R. Co. Abandonment, Crete Branch, 307 I.C.C. 189 (1959), the Commission applied a balancing test, weighing the financial needs of the railroad with the public's claim for continued service
 
 
 [40]
 I. & S. Docket No. 9108 at 36a
 
 
 [41]
 Id. at 36
 
 
 [42]
 By way of comparison, consider Greyhound Corp. v. ICC, 179 U.S.App.D.C. 228, 229, 551 F.2d 414, 417 (1977). In that case the ICC changed its definition of "principal source" of income from a source from which the company received over 50% Of its income to one from which the company received only 20%. It also changed the income figure used to determine these percentages from gross to net income. As a result of those changes, the ICC determined that the "principal source" of Greyhound's income was from regulated activities. In an earlier case, however, the ICC had held that a company with twice as much income from regulated sources (as Greyhound) did not have regulated activities as its "principal source" of income. See Lease Plan International Corp. Control National Trailer Convoy, Inc., 93 M.C.C. 203, 206-07 (1963). The extreme and unexplained discrepancy between the two decisions caused this Court to remand the case to the ICC for reconsideration
 
 
 [43]
 Id
 
 
 [44]
 The Commission discussed at length the significance of the Railroad Reorganization and Revitalization Act, the recommendations of the Final System Plan, and the legislative mandate that ConRail attempt to attain economic self-sufficiency through a streamlining of its route structure, I. & S. No. 9108 at 1-5. The ICC in its argument specifically emphasized the uniqueness of ConRail's position, Respondent's Brief at 28
 
 
 [45]
 49 U.S.C. § 15(8)(f) expressly places the burden of proof on common carriers to show that any proposed change in their tariff is just and reasonable
 
 
 [46]
 Petitioners' Brief at 11
 
 
 [47]
 49 U.S.C. § 1(4) provides in pertinent part: "It shall be the duty of every common carrier subject to this chapter to provide and furnish transportation upon reasonable request therefor, and to establish reasonable through routes with other such carriers, and just and reasonable rates, fares, charges, and classifications applicable thereto . . ."
 
 
 [48]
 Petitioners' Brief at 9
 
 
 [49]
 Id. at 11-12
 
 
 [50]
 Id. at 12-13
 
 
 [51]
 Id. at 13
 
 
 [52]
 Petitioners' Reply Brief at 8
 
 
 [53]
 The preamble to the Supplement to the Final System Plan explicitly pointed to the problem that "over the last twenty years the railroads in reorganization have not reduced the size of their physical plant as fast as their traffic has declined." See also Supplement to the Final System Plan 32-44, reproduced at Appendix to Petitioners' Brief at 3-15
 It also seems self-evident that a carrier should not be required in every instance to operate a great many stations with a total profit that was only marginal when greater profit could be obtained by furnishing the same service at fewer locations without serious prejudice to the public. A proper balance between the carrier's financial interest and the public convenience needs to be struck.
 
 
 [54]
 Respondents' Brief at 31
 
 
 [55]
 Petitioners do not offer concrete evidence that Sharon and Reading were in fact profitable, but rather argue that as ConRail did not demonstrate their unprofitability, it has not carried its burden of proof, Petitioners' Reply Brief at 8-9
 
 
 [56]
 For example, Sen.Rept.No. 94-499 p. 27 speaks of "dropping services on light density lines and passenger transportation (to) allow ConRail to become more profitable." See also note 53, Supra
 
 
 [57]
 See Preamble to the Supplement to the Final System Plan, reproduced at page 3 of the appendix to petitioners' Brief: "ConRail's management can build on these findings (of the Final System Plan and its Supplement) but must accept final responsibility for developing and refining its own plans for operation."
 
 
 [58]
 See, e. g., 49 U.S.C. § 12(1)(9a) (". . . The Commission is authorized and required to execute and enforce the provisions of this chapter . . .")
 
 
 [59]
 The only support advanced for their view by Petitioners is the fact that in Icing Services, U.S. Railroads, 343 I.C.C. 67 (1973), the Commission alluded to the fact that the services provided there were unprofitable. Petitioners' Reply Brief at 8
 
 
 [60]
 Final System Plan at 173; Supplement to the Final System Plan 32-44, reproduced at Appendix to Petitioners' Brief at 3-15
 
 
 [61]
 I. & S. No. 9108 at 40. The Commission in discussing the lack of potential for TOFC traffic growth at Sharon and Reading, also referred to the availability of nearby alternative TOFC terminals for industries using these two ramps
 
 
 [62]
 I. & S. No. 9108 at 37
 
 
 [63]
 See, Id