897 F.2d 561
 283 U.S.App.D.C. 107
 B.J. ALAN COMPANY, INC., Olde Glory Marketing, Limited,
Neptune Fireworks Company, Inc. and Consigned
Sales Company, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
United Parcel Service, Inc. (Oh), et al., Intervenors.
 No. 89-1485.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 26, 1990.
Decided March 2, 1990.
 
 Richard H. Streeter, Washington, D.C., for petitioners.
 Craig M. Keats, Deputy Associate Gen. Counsel, I.C.C., with whom Robert S. Burk, Gen. Counsel, Henri F. Rush, Deputy Gen. Counsel, I.C.C., James F. Rill, Asst. Atty. Gen., Robert B. Nicholson and Laura Heiser, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 Robert L. Kendall, Jr., Philadelphia, Pa., Everett Hutchinson, and James F. Moriarty, Washington, D.C., were on the brief for intervenors. Irving R. Segal, Philadelphia, Pa., also entered an appearance for intervenors.
 J. Thomas Tidd and Kenneth P. Kolson, Washington, D.C., entered an appearance for amicus curiae, Ass'n of American Railroads.
 Before WALD, Chief Judge, RUTH BADER GINSBURG and WILLIAMS, Circuit Judges.
 Opinion for the court filed by Circuit Judge RUTH BADER GINSBURG.
 RUTH BADER GINSBURG, Circuit Judge:
 
 
 1
 Petitioners B.J. Alan Company, Inc., Olde Glory Marketing, Limited, Neptune Fireworks Company, Inc., and Consigned Sales Company (the shippers) petition this court to review a decision of the Interstate Commerce Commission (ICC or Commission) that permits Intervenors United Parcel Service, Inc., an Ohio corporation, and United Parcel Service, Inc., a New York corporation (UPS), to discontinue transportation of common fireworks. We conclude that the Commission reasonably construed the statutory scheme Congress entrusted it to administer, and acted on the basis of sufficient evidence. We therefore affirm the Commission's decision.
 
 I.
 
 2
 UPS is a nationwide motor carrier system specializing in high-volume, small-package delivery. By establishing and maintaining uniform, simple methods of operation, UPS has afforded the public an efficient, low-cost service. As a common carrier subject to the Interstate Commerce Act, 49 U.S.C. Secs. 10101-10935, UPS files tariffs with the Commission setting forth the transportation services it offers and the rates it charges for those services. See id. Secs. 10761-66.
 
 
 3
 In November 1987, UPS filed tariff amendments, to become effective January 1, 1988, announcing that it would no longer accept for transportation common fireworks as defined in Department of Transportation Hazardous Material Regulations, 49 C.F.R. Sec. 173.100(r). Various fireworks shippers protested the proposed tariff change, claiming that their survival would be threatened by a loss of UPS's services. The shippers asked the Commission to suspend and investigate the tariff restriction before it became effective. The ICC declined to take action, and on January 1, 1988, UPS discontinued carriage of common fireworks.
 
 
 4
 Several weeks later, on March 21, 1988, the shippers filed with the Commission a formal complaint under 49 U.S.C. Sec. 11701. In a July 1988 decision, the Commission held that the transportation termination unreasonably discriminated against a class of traffic and ordered UPS to reinstate service to the fireworks shippers. B.J. Alan Co. v. United Parcel Service, 4 I.C.C.2d 704 (1988) (UPS I ).
 
 
 5
 On June 29, 1988, UPS petitioned this court to review the Commission's UPS I decision. Some two months later, however, on August 31, 1988, UPS asked the ICC to reopen the agency's adjudication pursuant to the Commission's authority to grant reconsideration "at any time on its own initiative because of material error." 49 U.S.C. Sec. 10322(g)(1). This court then granted the Commission's unopposed motion to hold judicial review of UPS I in abeyance pending resolution of the request for administrative reconsideration.
 
 
 6
 The ICC reopened the proceeding,[1] received additional evidence and, on June 30, 1989, reversed UPS I, this time holding that UPS's action in terminating its fireworks service was not unlawful. B.J. Alan Co. v. United Parcel Service, 5 I.C.C.2d 700 (1989) (UPS II ).[2] The Commission found that fireworks presented difficulties for UPS unlike those presented by any other commodity and disrupted UPS's normal operations. It also concluded that, although the shippers might encounter economic hardship with the loss of UPS service, they were not without options for alternate service. The shippers ask us to set aside the UPS II decision as contrary to law and unsupported by the record.
 
 II.
 
 7
 A common carrier undertakes to provide transportation service "on reasonable request," 49 U.S.C. Sec. 11101(a), and "may not subject a person, place, port, or type of traffic to unreasonable discrimination." 49 U.S.C. Sec. 10741(b). Subject to those strictures, however, "[a] common carrier is free to carve out as large or as small a [niche] as it feels appropriate." Steere Tank Lines, Inc. v. ICC, 675 F.2d 103, 105 (5th Cir.1982). An unlimited duty of carriage was never the rule. As counsel for the shippers acknowledged at oral argument, were UPS a new entrant applying to the ICC for certificate authority, it could exclude common fireworks from the proposed service that it declares itself fit, willing, and able to provide:
 
 
 8
 COURT: Suppose the Commission got an application today for a [new] carrier that says: "We want to do the same thing UPS is doing only we are going to exclude fireworks." Would you say that the Commission could not give such a restrictive certification?
 
 
 9
 COUNSEL: Obviously, if a carrier, particularly in the old days, when you applied for authority you would limit it to specific commodities, and your holding out was defined in terms of what you applied for, so that if you wanted to apply for general commodities with the exception of Class A, B, and C explosives, yes you could do that....
 
 
 10
 COURT: I am not asking about the old days when everything was carved up by many commodities restrictions and geographic restrictions. Today....
 
 
 11
 COUNSEL: Today that could also be done.
 
 
 12
 Disagreement, therefore, reduces to the question, what must a carrier show, once it has engaged in broad service, to delete a class of goods from the scope of its operations. The key showing, as we comprehend the Commission's opinion, is inordinate operational burdens on the carrier's side, with hardship to the shippers an offsetting consideration. In examining a request to reduce operations, the Commission has been frank to state, changed regulatory and market conditions are accorded heavy weight: the ICC currently "look[s] at common carrier obligation issues in light of our overall regulatory policy and the prevailing competitive climate in the transportation industry." UPS II, 5 I.C.C.2d at 713. We review the instant decision mindful of the Commission's leitmotif: "[T]he obligation to serve ... can and does change to reflect the commercial realities of the transportation marketplace and the attending scheme of regulation." Id. Congress so signaled in the Motor Carrier Act of 1980. See 49 U.S.C. Sec. 10101(a)(2); H.R.REP. NO. 1069, 96th Cong., 2d Sess. 14 (1980), U.S.Code Cong. & Admin.News 1980, p. 2283.
 
 
 13
 During the early days of motor carrier regulation, the ICC strictly regulated entry and issued narrowly circumscribed certificates. "In exchange for their franchises, the carriers were expected to provide reasonably continuous and adequate service [coextensive with] their certificates." UPS II, 5 I.C.C.2d at 712; see Restrictions on Service by Motor Common Carriers, 111 M.C.C. 151, 168-69 (1970). "But even in the earliest rail cases, the obligation to provide service was not held to be absolute, but rather was qualified by a rule of reason that excused carriers from service failures that were reasonable under the prevailing circumstances." UPS II, 5 I.C.C.2d at 711 (citing Pennsylvania R.R. v. Puritan Coal Mining Co., 237 U.S. 121, 133, 35 S.Ct. 484, 488, 59 L.Ed. 867 (1914)).
 
 
 14
 "[T]he Commission changed its regulatory approach to motor carrier regulation [in the 1970s] and relaxed its regulation of entry." Id. at 712. In 1983, stating that its current position coincided with that of the Fifth Circuit in Steere, 675 F.2d at 105, the Commission declared that a "common carrier is not in violation of its obligations if it declines to provide service within the scope of its operating authority because such service is economically or operationally impracticable in the circumstances at the time of the service request." Elimination of Certificates as the Measure of "Holding Out," 48 Fed.Reg. 11,136, 11,137 (1983).
 
 
 15
 In UPS II, the ICC emphasized that, in today's regulatory environment, a carrier is not limited "to choosing the scope of service it will offer only at the time it begins to operate," but has a "right to reduce that scope as time passes." 5 I.C.C.2d at 713. Defining the "economically or operationally impracticable" standard it now employs in judging service cutbacks, the Commission noted:
 
 
 16
 The word "impracticable" in a literal sense means that something is not capable of being carried out. But, ... our intent in the [1983] Elimination case was not to erect a standard of "impossibility" in assessing carrier services in light of the common carrier obligation. Rather, our intent was and is simply to assess whether a carrier's service determinations are reasonable under the prevailing circumstances, including the prevailing transportation conditions.
 
 
 17
 Id. at 713 n. 15. Satisfied that the ICC has legitimately interpreted the statutory requirements that a carrier serve on "reasonable request" and refrain from "unreasonable discrimination,"[3] see supra p. 563, we turn to the sufficiency of the record support for the ICC's finding that it was "operationally impracticable" for UPS to continue carriage of common fireworks.
 
 III.
 
 18
 Common fireworks, the Commission concluded from evidence it identified, "present transportation problems to UPS that are markedly different from those associated with other small packages that UPS handles." UPS II, 5 I.C.C.2d at 709 n. 8. It had become "increasingly difficult and expensive," id. at 713, the ICC found, for UPS to comply with a welter of diverse state and local regulations governing the possession and delivery of fireworks, in no small measure because shippers had proved "unwilling or unable to conform" to destination-imposed prohibitions and permit requirements. Id. at 703, 709 n. 8, 714. UPS "documented numerous and repeated instances in which it has had to return shipments because delivery would have been unlawful." Id. at 714. Adding to the special handling burden, under Department of Transportation safety regulations, 49 C.F.R. Sec. 172.504(c), "[i]f 1,000 pounds or more of Class C fireworks are to be loaded onto a vehicle, the carrier must ... identify that vehicle with an appropriate warning placard, or ... divert part of the load to a different vehicle." UPS II, 5 I.C.C.2d at 714.
 
 
 19
 Rendering the conditions attending carriage of fireworks not only "dissimilar from those associated with small packages generally," id. at 709, but dramatically so, the trade is extraordinarily concentrated; "[l]arge volumes of common fireworks are tendered for shipment during a short season preceding the July 4th holiday." Id. at 703. "[N]o other industry distributes such enormous volumes of Class C commodities by mail order in such a short period of time." Id. In sum, we find the Commission's decision adequate on this critical point: The transportation of fireworks notably hampered the efficient operation of a UPS "system that derives its strength from the ability to ignore the contents of the package and treat all packages alike." Id. at 709 n. 8.
 
 
 20
 The shippers view the record as fatally defective because it does not show carrying common fireworks was a profitless venture for UPS. Indeed, the shippers sought discovery on this point. We agree with UPS that it sufficed to show that transporting fireworks required special attention and extra costs. The Commission did not act arbitrarily or out of accord with the law in refusing to insist that UPS either continue the cross-subsidy by other small package shippers or eliminate one of UPS's hallmarks--"its uniform rate structure." Id. at 715.
 
 
 21
 The ICC recognized the prospect of economic hardship to the fireworks shippers from the loss of UPS service. Id. Alternate service, we do not question, is currently more expensive and less convenient than is UPS service, and there may be some areas not served at all by alternate carriers. See UPS II, 5 I.C.C.2d at 704 (alternates are more expensive and do not serve certain areas); id. at 722 (Simmons, V.C., dissenting) (same). UPS service is unique in specializing in the transportation of small parcels, utilizing a uniform rate structure based on weight and distance and not on the contents of the package, providing automatic pick-up at a flat charge per week and residential deliveries at no extra charge, using simplified shipping documents, and offering definite, expeditious transit times. Id. at 704-05. Furthermore, the United States Postal Service, UPS's strongest competitor, is prohibited by statute from carrying fireworks. See 18 U.S.C. Sec. 1716(a).
 
 
 22
 The Commission observed, however, that shippers could resort, and in fact had resorted, to other service, for example, Federal Express. UPS II, 5 I.C.C.2d at 715. The ICC further observed that "[e]ntry of new carriers into this market is relatively free of ICC regulatory barriers. And, the prevailing competitive climate suggests no inherent structural barrier to new service or expansion of existing service." Id. at 716.[4]
 
 CONCLUSION
 
 23
 We conclude that the ICC's operational impracticability standard for permitting the termination at issue comports with the Commission's statutory charge, and that substantial evidence supports the ICC's determination. Accordingly, the petition for review is denied, and the Commission's decision in UPS II is
 
 
 24
 Affirmed.
 
 
 
 [1]
 The shippers assert that, once UPS petitioned for court review, the ICC lacked jurisdiction to reopen. Precedent does not support that assertion. The Commission has discretion to reconsider, so long as its resumption does not conflict with proceedings in court. See American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 541-42, 90 S.Ct. 1288, 1293-94, 25 L.Ed.2d 547 (1970). This court had not yet taken up the case for preparation and argument at the time the Commission, without objection, asked us to hold UPS I in abeyance. See id. at 542, 90 S.Ct. at 1294; see also Anchor Line Ltd. v. FMC, 299 F.2d 124, 125 (D.C.Cir.), cert. denied, 370 U.S. 922, 82 S.Ct. 1563, 8 L.Ed.2d 503 (1962). Moreover, we have recognized that "[a]dministrative reconsideration is a more expeditious and efficient means of achieving an adjustment of agency policy than is resort to the federal courts." Commonwealth of Pennsylvania v. ICC, 590 F.2d 1187, 1194 (D.C.Cir.1978)
 
 
 [2]
 UPS thereupon withdrew the petition for judicial review of UPS I
 
 
 [3]
 It is not disputed that UPS's tariff alteration treats all fireworks shippers the same and there is here no question of rate disparity or competitive injury to the complaining parties. See UPS II, 5 I.C.C.2d at 707
 
 
 [4]
 The shippers note in the legislative history of the Motor Carrier Act of 1980, Pub.L. No. 96-296, 94 Stat. 793 (1980), a congressional concern that motor carriers continue to provide service to small communities. See, e.g., CONG.REC. 15589 (1980) (Rep. Harsha); 126 CONG.REC. 7790 (1980) (Sen. Baucus). We see nothing in the legislative history, however, that protects the carriage of explosive commodities so as to bar the Commission's action in this proceeding